**DISTRICT OF COLUMBIA ex rel. W.J.D., Appellant,**

v.

**E.M., Appellee.**

**DISTRICT OF COLUMBIA ex rel. M.E.S., Appellant,**

v.

**S.E.B., Appellee.**

**Nos. 81–1483, 80–1260.**

District of Columbia Court of Appeals.

No. 81–1483; Argued Sept. 14, 1982.

No. 80–1260; Argued Dec. 1, 1982.

Decided Sept. 23, 1983.

John C. Maginnis, III, Washington, D.C., for appellant in No. 81–1483.

Joseph A. Blaszkow, Washington, D.C., with whom Patrick J. Christmas, Washington, D.C., was on the brief, for appellee in No. 81–1483.

Constance C. Chatwood, Washington, D.C., for appellant in No. 80–1260. Scott D. Gilbert, Washington, D.C., also entered an appearance for appellant in No. 80–1260.

Pamela B. Forbes, Washington, D.C., for appellee in No. 80–1260.

Before BELSON and TERRY, Associate Judges, and KELLY,* Associate Judge, Retired.

BELSON, Associate Judge:

In the cases before us we address the constitutionality of D.C.Code § 16–2342 (1981), the statute which imposes, with certain exceptions, a 2-year period of limitations on actions brought to establish pater-

nity and provide child support. We hold that period of limitations unconstitutional.

In both cases here on appeal the District of Columbia Corporation Counsel initiated actions in Superior Court to establish paternity and provide support for two minor children born out of wedlock. The Corporation Counsel is empowered to initiate such actions on behalf of children born out of wedlock when "a public burden has been incurred or is threatened." D.C.Code § 16–2341 (1981). In both cases appellees opposed the actions on the ground that they were not timely under D.C.Code § 16–2342 which, as we have noted, imposes a 2-year statute of limitations on such actions. At roughly that stage in both proceedings the Corporation Counsel withdrew, and substitute counsel was appointed for appellants, who challenged the constitutionality of § 16–2342.[1] Specifically, appellants contended that the statute of limitations discriminated impermissibly against children born out of wedlock, thereby denying them equal protection of the laws. Both actions were dismissed as untimely, and these appeals followed.

For the reasons stated below, we conclude that the challenged statutory provision does deny equal protection to children born out of wedlock.[2] Accordingly, we reverse the trial court's dismissals of these actions and remand for further proceedings.

In Parts I and II of this opinion, respectively, we discuss the statutory framework of § 16–2342, as well as recent judicial decisions that have addressed the constitutionality of similar statutes of limitations. Finally, in Part III we explain why, in light of

---

* Judge Kelly was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on March 31, 1983.

1. In both cases, Corporation Counsel requested permission to withdraw because of the potential conflict of interest inherent in a challenge to the constitutionality of a District of Columbia statute by a representative of the government of the District of Columbia.

2. The equal protection clause appears in the Fourteenth Amendment, which applies only to the states. In *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954), however, the Supreme Court ruled that the due process clause of the Fifth Amendment extended equal protection guarantees to the District of Columbia.

the background set forth in the preceding sections, § 16–2342 is unconstitutional.

I

■ In 1977 the District of Columbia City Council abolished the traditional distinction between legitimate and illegitimate children, declaring that "[a] child born in wedlock or born out of wedlock is the legitimate child of its father and mother . . . ." District of Columbia Marriage and Divorce Act, D.C.Law 1–107, § 105(a), 23 D.C.Reg. 8738 (1977) (codified at D.C.Code § 16–908 (1981)). In the District of Columbia all minor children, whether born in wedlock or out of wedlock, are owed a legal duty of support by their parents. D.C.Code §§ 16–916, 30–320 (1981). This duty of support arises automatically upon the establishment of parentage by sufficient proof. *Felder v. Allsopp,* 391 A.2d 243, 246 (D.C.1978).

■ A child's relationship to his mother is conclusively established by his birth to her. D.C.Code § 16–909(a) (1981). Under D.C.Code § 16–909(a)(1)–(3) a man is presumed to be a child's father if specified circumstances related to marriage or attempted marriage are present.[3] When parentage is contested, however, an action to establish parentage and provide for support must be brought pursuant to § 16–2342, the

statute challenged in these appeals. Section 16–2342 provides that:

> Proceedings . . . to establish parentage and provide for support of a child born out of wedlock may be instituted after four months of pregnancy or within two years after the birth of the child, or within one year after the putative father or mother, as the case may be, has ceased making contributions to the support of the child. The time during which the respondent is absent from the jurisdiction shall be excluded from the computation of the time within which a complaint may be filed.

The practical effect of the statutory provisions outlined above is that adopted children, and children born in wedlock or 300 days thereafter, or to parents who attempted a ceremonial marriage before the birth of the child, or who attempted a ceremonial marriage after the birth of the child where the father acknowledged parentage, may seek support from their parents at any point during minority. Children born out of wedlock who do not fall within the relevant exceptions have an equal right to parental support, but generally must bring paternity actions within 2 years of birth, or forever forfeit the right to obtain that support.[4] There is no dispute that § 16–2342 discriminates against children born out of

---

**3.** Section 16–909(a) states that:

A child's relationship to its father is established by proving by a preponderance of evidence that he is the father, and there shall be a presumption that he is the father:

(1) if he and the child's mother are or have been married and the child is born during the marriage, or within 300 days after the termination of marital cohabitation by reason of death, annulment, divorce, or separation ordered by a court; or

(2) if, prior to the child's birth, he and the child's mother have attempted to marry, and some form of marriage [ceremony] has been performed in apparent compliance with law, though such attempted marriage is or might be declared void for any reason, and the child is born during such attempted marriage, or within 300 days after the termination of such attempted marital cohabitation by reason of death, annulment, divorce, or separation ordered by a court; or

(3) if, after the child's birth, he and the child's mother marry or attempt to marry, (with the attempt involving some form of marriage ceremony that has been performed in apparent compliance with law), though such attempted marriage is or might be declared void for any reason, and he has acknowledged the child to be his.

If questioned, a presumption created under § 16–909(a)(1)–(3) may be resolved in the Superior Court. *Id.* § 909(b).

**4.** There are two exceptions to the general rule. If a putative parent contributes to the support of a child born out of wedlock, and later ceases furnishing such support, an action to establish parentage and provide for support must be brought within 1 year of the cessation of such payments. D.C.Code § 16–2342 (1981). In addition, any period during which the putative parent is absent from the District of Columbia is excluded from the computation of the time within which the complaint must be filed. *Id.*

wedlock. The question that we address is whether this discrimination offends constitutional guarantees of equal protection.

## II

In a series of decisions that started in 1968, the Supreme Court has recognized the rights of illegitimate children[5] to equal protection in such areas as entitlement to state and federal benefits, inheritance rights under state law, and parental support. *See, e.g., United States v. Clark,* 445 U.S. 23, 100 S.Ct. 895, 63 L.Ed.2d 171 (1980); *Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978); *Trimble v. Gordon,* 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977); *Mathews v. Lucas,* 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976); *New Jersey Welfare Rights Organization v. Cahill,* 411 U.S. 619, 93 S.Ct. 1700, 36 L.Ed.2d 543 (1973); *Gomez v. Perez,* 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973); *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); *Labine v. Vincent,* 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971); *Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968); *Glona v. American Guarantee & Liability Insurance Co.,* 391 U.S. 73, 88 S.Ct. 1512, 20 L.Ed.2d 436 (1968). These decisions indicate that while children born out of wedlock do not constitute a "suspect class" that warrants strict judicial scrutiny, classifications that distinguish between legitimate and illegitimate children should be subjected to an intermediate level of equal protection review. *See Mathews, supra,* 427 U.S. at 504, 510, 96 S.Ct. at 2761, 2764. This intermediate level of scrutiny requires more than a "mere incantation of a proper state purpose." *Trimble, supra,* 430 U.S. at 769, 97 S.Ct. at 1464. Instead, legislation that discriminates against such "almost suspect" classifications must be narrowly tailored to further an important or substantial governmental interest. *See, e.g., Kirchberg v. Feenstra,* 450 U.S. 455, 460–61, 101 S.Ct. 1195, 1198–99, 67 L.Ed.2d 428 (1981); *Clark, supra,* 445 U.S. at 27, 100 S.Ct. at 899; *Lalli, supra,* 439 U.S. at 275, 99 S.Ct. at 528; *cf. Weber, supra,* 406 U.S. at 170, 175, 92 S.Ct. at 1404, 1406.

Quite recently, the Supreme Court has twice addressed the issue that confronts us here: the right of illegitimate children to equal protection in the context of statutes of limitations governing the initiation of paternity actions. In a 1982 decision, *Mills v. Habluetzel,* 456 U.S. 91, 102 S.Ct. 1549, 71 L.Ed.2d 770 (1982), the Court ruled that the Texas counterpart to § 16–2342, which imposed a flat, 1-year period for bringing such actions, was unconstitutional.[6] Approximately 1 year later in *Pickett v. Brown,* —— U.S. ——, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983), the Court applied the principles announced in *Mills* to Tennessee's more flexible 2-year statute of limitations[7] and

---

**5.** In the ensuing legal discussion we will use the terms illegitimate and legitimate in the traditional sense in which the Supreme Court has used them in this area of the law, while recognizing as we have in the text above that the District of Columbia has by statute abolished the traditional distinction between legitimacy and illegitimacy.

**6.** Tex.Fam.Code Ann. § 13.01 (Vernon 1975). Under an amendment that became effective on September 1, 1981, this period was enlarged to 4 years. *See Mills, supra,* 456 U.S. at 95 n. 1, 102 S.Ct. at 1552 n. 1. Because the appellant in *Mills* was over 4 years of age on that date, and the unlikelihood that the Texas courts would apply the statute retroactively, the Court concluded that the statute's amendment, which occurred during the pendency of the case, did not render the appeal moot. *See id.* Five members of the Court, however, were careful to stress that the majority's opinion should not be construed as approving Texas' current 4-year statute of limitations. *See id.* at 102, 102 S.Ct. at 1556 (O'Connor, J., with Burger, C.J., Brennan & Blackmun, JJ., concurring); *id.* at 106, 102 S.Ct. at 1558 (Powell, J., concurring in judgment).

**7.** The statute challenged in *Pickett* provided that when an illegitimate child was a public charge, or likely to become one, the state welfare agency or "any person" could initiate filiation proceedings at any time during the child's minority. Unless the father had acknowledged paternity in writing or by contributing to the child's support, however, the statute required that all other actions to establish paternity be initiated by the mother or her personal repre-

concluded that it too was unconstitutional.[8]

In both *Mills* and *Pickett* the Court began its analysis by noting its previous holding in *Gomez v. Perez, supra,* that once a state recognizes a judicially enforceable right of children to support from their natural parents, the equal protection clause prohibits the state from denying the same right to illegitimate children. The Court reasoned that if that holding is to have any meaning, "the support opportunity provided by the [s]tate to illegitimate children must be more than illusory." *Mills, supra,* 456 U.S. at 97, 102 S.Ct. at 1553; *see Pickett, supra,* 103 S.Ct. at 2204. The Court has explained that states must provide a period for asserting the right to support that is "sufficiently long to permit those who normally have an interest in such children to bring an action on their behalf despite the difficult personal, family, and financial circumstances that often surround the birth of a child outside of wedlock." *Mills, supra,* 456 U.S. at 97, 102 S.Ct. at 1553; *see Pickett, supra,* 103 S.Ct. at 2204.

At the same time, the Court has acknowledged that the state has a legitimate interest in preventing the litigation of stale or fraudulent claims. *See Pickett, supra,* 103 S.Ct. at 2204; *Mills, supra,* 456 U.S. at 98–99, 102 S.Ct. at 1554. This state interest is stronger in support suits brought on behalf of illegitimate children because such suits require proof of paternity, an element absent from support suits brought on behalf of legitimate children. *Mills, supra,* 456 U.S. at 99, 102 S.Ct. at 1554. The opinion of the Court in *Mills* indicated that states need not adopt the same statute of limitations for the bringing of support suits on behalf of legitimate and illegitimate children. *See id.*[9]

The Court's equal protection analysis, therefore, has focused on two interrelated requirements:

First, the period for obtaining support granted ... to illegitimate children must be sufficiently long in duration to present a reasonable opportunity for those with an interest in such children to assert claims on their behalf. Second, any time limitation placed on that opportunity must be substantially related to the

---

sentative within 2 years of the child's birth. Tenn.Code Ann. § 36–224(1) (1977).

The *Pickett* litigation had been initiated by the child's mother nearly 10 years after his birth. *See* 103 S.Ct. at 2202. The mother apparently did not allege that the child was or would become a public charge. Rather, she challenged the constitutionality of the 2-year statute of limitations that governed actions involving privately supported illegitimate children. *See id.* The trial court ruled that the 2-year portion of the statute was unconstitutional because, *inter alia,* by allowing some paternity actions to be brought at any point during a child's minority, the legislature had undercut the rationale for the 2-year limitation on other actions: the prevention of stale paternity claims. *See id.* On interlocutory appeal, the state's supreme court reversed this ruling, on the ground that the statute satisfied *Mills. Pickett v. Brown,* 638 S.W.2d 369 (Tenn.1981).

8. Since *Mills,* courts in at least six states have addressed similar challenges, reaching conflicting conclusions on whether various statutory schemes satisfied the *Mills* criteria. *Compare Shifter v. Wolf,* 120 Mich.App. 182, 327 N.W.2d 429 (1982) (Michigan's 6-year statute constitutional) *and Astemborski v. Susmarski,* 499 Pa. 99, 451 A.2d 1012 (1982) (Pennsylvania's 6-year

statute constitutional), *vacated and remanded mem.,* —— U.S. ——, 103 S.Ct. 3105, 77 L.Ed.2d 1360 (1983) *and Pickett v. Brown,* 638 S.W.2d 369 (Tenn.1982) (Tennessee's 2-year statute constitutional), *rev'd,* —— U.S. ——, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983) *with Oregon ex rel. Adult & Family Serv. Div. v. Bradley,* 58 Or.App. 663, 650 P.2d 91 (1982) (Oregon's 6-year statute unconstitutional), *aff'd,* 9 Fam.L.Rep. (BNA) 2573 (Or.Aug. 2, 1983) *and In re M.D.H.,* Ind.App., 437 N.E.2d 119 (1982) (Indiana's 2-year statute unconstitutional) *and In re Wiggins,* 9 Fam.L.Rep. (BNA) 2552 (N.Y.Fam.Ct., Queens Co. July 26, 1983) (New York's 2-year statute unconstitutional).

9. It should be noted, however, that Justice O'Connor's concurrence in *Mills* joined in by Chief Justice Burger and Justices Brennan and Blackmun, and Justice Powell's concurrence in the judgment, considered together, suggest that a majority of the Court may be inclined toward ruling unconstitutional any statute of limitations that bars the bringing of paternity actions at any time during an illegitimate child's minority. *See Mills, supra,* 456 U.S. at 106, 102 S.Ct. at 1558.

State's interest in avoiding the litigation of stale or fraudulent claims.

*Id.* at 99–100, 102 S.Ct. at 1555; *see Pickett, supra,* 103 S.Ct. at 2204. The determination of whether a particular statute of limitations satisfies this two-part test requires an examination of the flexibility and practical adequacy of the limitations period, the degree to which a particular state has demonstrated its interest in preventing the litigation of stale and fraudulent claims, and the extent to which the state's chosen means furthers that interest. As discussed below, we conclude that § 16–2342 satisfies neither aspect of the *Mills* test.

### III

#### A.

Under the *Mills* analysis, the initial issue that we must consider is whether § 16–2342 provides a period that is sufficiently long to enable persons with an interest in the welfare of a child born out of wedlock to assert a claim on his behalf. In this regard the District of Columbia statute must be regarded as inadequate for the same reasons that the Tennessee statute at issue in *Pickett* was inadequate.

First, as the *Pickett* Court recognized, the same practical and emotional obstacles that might prevent the initiation of a filiation proceeding within 1 year of birth "are likely to persist during the child's second year as well." 103 S.Ct. at 2206. Given the continuing nature of such obstacles, it is reasonable to conclude that it would not be unusual for more than 2 years to elapse before an attempt would be made to enforce the rights of a child born out of wedlock. An ongoing harmonious relationship between the parents of a child born out of wedlock, for instance, can make legal action unlikely. Alternatively, where the parents' relationship has ended, the hope of reconciliation or obtaining voluntary cooperation, the desire to avoid retribution, or fear of family disruption or disapproval could well prompt the mother, who is the person most likely to pursue the matter, to postpone legal action. *See generally id.*[10]

Even when the foregoing considerations are absent, an actual need for the mother to seek contributions from the father may not arise for a number of years. For example, an unwed mother might be able to shoulder the entire support obligation until the child is 5 or 10 years old. If she then loses her job and for the first time requires financial assistance from the putative father, an action under § 16–2342 to establish parentage and obtain support would be impossible.[11]

Finally, the District of Columbia does not have standing to initite paternity proceedings on behalf of a child born out of wedlock until the mother applies for public assistance. *See* D.C.Code § 16–2341 (1981). Oftentimes the mother does not apply for such assistance until after the statutory period has run, thereby preventing the Corporation Counsel from initiating action under

---

**10.** In the AFDC (Aid to Families with Dependent Children) program, for example, Congress has recognized the ongoing nature of such obstacles to a mother's participation in paternity and support proceedings. Mothers seeking benefits under the program are required to cooperate with the state in establishing the paternity of a child born out of wedlock unless, taking into consideration the best interest of the child, there is a "good cause" for noncooperation. 42 U.S.C. § 602(a)(26)(B) (1976). According to Department of Health and Human Services regulations, "good cause" exists, *inter alia,* when physical or emotional harm to the child will result, or when there will occur emotional or physical damage to the mother that would impair her ability to care for the child. *See* 45 C.F.R. § 232.42 (1982).

**11.** By contrast, a child born in wedlock would suffer no such extinguishment of his right to parental support if a custodial parent were to delay in seeking support contributions from the noncustodial parent. If the custodial parent were in circumstances that made it unnecessary to seek contributions from the noncustodial parent for several years, the custodial parent could still, when the financial need arose, go to court after years of inaction and obtain support under D.C.Code § 16–916 (1981). *See generally J.L.P.* v. *C.L.B.,* 107 Wash.D.L.Rptr. 401, 405–06 (D.C.Super.Ct. Jan. 30, 1979).

§ 16–2341 in a timely fashion.[12] Even when the application for public assistance is made within 2 years, the volume of public-assistance-related support actions frequently prevents the government from acting with sufficient promptness to avoid the statutory bar.[13]

In sum, 2 years is in many instances an insufficient period of time for private parties or the District of Columbia to recognize or act upon the need to protect the right of an illegitimate child to parental support. Unfortunately, it is the child, not the parties who failed to undertake timely action on his behalf, who suffers as a result. In effect, the unreasonably short limitations period set forth in § 16–2342 often frustrates the child's right of support from *both* parents throughout minority recognized in D.C.Code § 30–320. In addition, the statute thwarts the effectiveness of D.C.Code § 16–2341, which was designed to ensure that whenever possible the primary burden for the support of children born out of wedlock should fall on the parents, not the government. As will be discussed below, the governmental interests purportedly advanced by § 16–2342 fail, in our view, to justify the brevity of the limitations period.

### B.

The sole justification that has been advanced in support of § 16–2342 is that the statute, like all statutes of limitations, prevents to some degree the litigation of stale or fraudulent claims, and curtails problems of proof that may increase with the passage of time. At the outset we question whether, given the illegitimate child's statutory right to parental support throughout minority, a support claim raised on behalf of a minor child, considered in its entirety, can accurately be characterized as stale.[14] The facts surrounding a child's needs never become stale, for the needs constantly arise. We acknowledge that, on the other hand, what does tend to become stale is the claim that the putative father is, in fact, the father of the child. What we must weigh, in light of all the circumstances, is the substantiality of the District of Columbia's interest in foreclosing such suits to the extent they are foreclosed by § 16–2342.

First, it is significant that in the District of Columbia actions to establish paternity, unlike other causes of action, are not tolled during the plaintiff's minority. Under D.C.Code § 12–302, the statute of limitations on bringing causes of action does not begin to run until the plaintiff has reached his majority. *See Canterbury v. Spence*, 150 U.S.App.D.C. 263, 284, 464 F.2d 772, 793, *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). Section 12–302, therefore, embodies a legislative judgment that the government's legitimate interest in preventing litigation of stale claims is not so important that it cannot be subordinated to the policy of shielding minors from the consequences of their inability to protect their own interests. Section 12–302 thus undercuts the rationale advanced for § 16–2342: having chosen to tolerate the possibility of stale claims in other actions involving the rights of minors, the government acts

---

**12.** The instant action on behalf of W.J.D. illustrates this problem. W.J.D. was born in September 1972. Not until December 1976 did the child's mother, as a condition to receiving public assistance, assign her support rights to the District of Columbia. Thus, the statutory period had expired before the Corporation Counsel could act on the child's behalf.

**13.** *See generally* Family Court Report of the D.C. Court System Study Committee of the District of Columbia Bar at 20–21 (1981) (due to processing backlogs, total time required to bring public assistance support cases *to the* point of court action may be 2 or 3 years).

**14.** As the Supreme Court of Florida has noted:

[The] right to support is a continuing right renewing itself until the child becomes eighteen. An action to determine paternity is not a stale claim when employed as a prerequisite to an illegitimate's obtaining of continuing, recurring support. This right has never become dormant, and for the statute of limitations to act to preclude this right on the basis that it is stale is illogical.

*State Dept. of Health & Rehabilitation Servs. v. West*, 378 So.2d 1220, 1227 (Fla.1979); *accord In re M.D.H., supra* note 8, 437 N.E.2d at 128.

inconsistently if it maintains that its interest in avoiding stale litigation over paternity is so compelling as to justify the exceptional burden that § 16–2342 imposes upon children born out of wedlock. Indeed, the fact that paternity actions under § 16–2342 are singled out in this manner suggests that this legislation may not even further a permissible, much less "important" or "substantial" governmental interest. *See Pickett, supra,* 103 S.Ct. at 2208; *Mills, supra,* 456 U.S. at 105, 102 S.Ct. at 1557 (O'Connor, J., with Burger, C.J., Brennan & Blackmun, JJ., concurring).

Second, the District of Columbia has countervailing interests in seeing that genuine claims for support are satisfied. The primary purpose of the statutory scheme of which § 16–2342 is a part is the protection of the child's welfare. *See District of Columbia v. Turner,* 154 A.2d 925, 926 (D.C. 1959); *J.L.P. v. C.L.B., supra* note 11, 107 Wash.D.L.Rptr. at 406.[15] The strength of the District of Columbia's interest in this regard is illustrated by the fact that our courts may disregard the terms of a voluntary support agreement that does not adequately provide for the needs and welfare of the child or children involved. *See Foley v. Foley,* 336 A.2d 549, 550–52 (D.C.1975); *Davis v. Davis,* 268 A.2d 515, 517–18 (D.C. 1970). The statute in question tends to defeat the goal of protecting the child's welfare.

An additional, albeit secondary, interest of the District is reducing the burden on the public welfare system by ensuring that parents, rather than the taxpayers as a whole, bear the primary responsibility for supporting children born out of wedlock. *See J.L.P. v. C.L.B., supra* note 11, 107 Wash.D. L.Rptr. at 406; *accord Pickett, supra,* 103 S.Ct. at 2207 n. 13; *Mills, supra,* 456 U.S. at 103–04, 102 S.Ct. at 1556–57 (O'Connor, J., with Burger, C.J., Brennan & Blackmun, JJ., concurring); *id.* at 105, 102 S.Ct. at 1557 (Powell, J., concurring in judgment); *cf. In re M.D.H., supra* note 8, 437 N.E.2d at 128–29.[16] The operation of § 16–2342, however, is in direct conflict with both of these governmental interests, a fact that assumes particular significance in light of the high percentage of children who are born out of

---

**15.** The legislative history of the District of Columbia Court Reform and Criminal Procedure Act of 1970 [hereinafter cited as 1970 Court Reform Act] demonstrates that Congress enacted § 16–2342 in the hope of better providing for the support of children:

> Another important reform . . . consists of the elimination of the criminal or quasi-criminal incidents of nonsupport and paternity proceedings. Under current law and practice such matters create considerable congestion in the trial calendar of the juvenile court and are regularly "prosecuted;" most important, fathers who should be supporting their families are made subject to criminal sentence. The new proceedings, in contrast, will be entirely civil in nature and will change the focus from punishment of the putative father to provision for support of the minor child and children.

SENATE COMM. ON THE DISTRICT OF COLUMBIA, 91ST CONG., 2D SESS. STATEMENT OF THE MANAGERS ON THE PART OF THE SENATE SUBMITTED REGARDING THE CONFERENCE ACTION UPON S. 2601, THE PRESIDENT'S CRIME LEGISLATION FOR THE DISTRICT OF COLUMBIA 14 (Comm. Print 1970).

**16.** In 1970 the House Committee on the District of Columbia explained that one of the purposes of the 1970 Court Reform Act's modifications to paternity proceedings was the reduction of the District's welfare expenditures:

> Under existing provisions of the Juvenile Code paternity proceedings, essentially an adult matter, are lumped together with the jurisdiction over juvenile cases. From the time the Juvenile Court began to accumulate its backlog in 1958 there has been a gradually increasing pressure on judicial time as between the court's exclusive jurisdiction and the adult jurisdictions exclusively assigned to it.
>
> \* \* \* \* \* \*
>
> The District of Columbia bears a very substantial burden of public support because of the large number of cases where the mother and child are compelled to seek support at the cost of the local and federal governments. When a question of paternity has been settled by court determination, the court order of support may be enforced by the exercise of certain sanctions to actively enforce collections under such orders.
>
> *The District of Columbia reduces the costs of its welfare by the amounts collected.* . . .

H.R. REP. No. 91–907, 91st Cong., 2d Sess. 58–59 (1970), *reprinted in* [1970] D.C.Code Leg. & Ad.Serv. at 453 (emphasis added).

wedlock in the District of Columbia. *See generally* Washington Post, Aug. 20, 1983, § A1, col. 1 (during 1982 56.7% of all births in District of Columbia occurred out of wedlock).

In addition, we observe that the argument that the government has a strong interest in precluding actions like those before us is even further undermined when one considers that paternity suits brought pursuant to the Uniform Reciprocal Enforcement of Support Act, D.C.Code § 30–301 *et seq.* (1981), against a putative father living in the District of Columbia may be maintained at any time during the child's minority. *See Harris v. Kinard,* 443 A.2d 25 (D.C.1982). Thus, our laws permit this anomaly: if the mother moves her residence from the District into another state and brings action under the Uniform Act, the limitation does not apply; if she remains here, it does. This suggests the further anomaly that the District is more concerned over the welfare burdens of other localities than its own.

■■■ Given these countervailing interests, it is our view that the interest in limiting stale or fraudulent claims which § 16–2342 purportedly furthers, while legitimate, is entitled to relatively little weight in the context of paternity actions. As we explain below, however, even if we were to accept at face value appellees' contentions regarding the strength of the government's interest in this regard, the absence of a substantial relationship between § 16–2342 and that governmental interest is insufficient to withstand intermediate-level equal protection scrutiny.

**C.**

In *Mills* the Supreme Court explained that the state's interest in avoiding the litigation of stale or fraudulent claims "will justify those periods of limitation that are sufficiently long to present a real threat of loss or diminution of evidence." 456 U.S. at 99, 102 S.Ct. at 1554. This is, we suppose, another way of saying that the state's interest in that regard will justify periods of limitation which are as long as they can be without presenting a real threat of loss or diminution of evidence. In *Pickett* the Supreme Court concluded that Tennessee's 2-year statute failed to satisfy this standard because the Court could " 'conceive of no evidence essential to paternity suits that will be lost in only [two years], nor is it evident that the passage of [24] months will appreciably increase likelihood of fraudulent claims.' " 103 S.Ct. at 2207 (quoting *Mills, supra,* 456 U.S. at 101, 102 S.Ct. at 1555 (footnote omitted)). We believe that § 16–2342 is defective for the same reasons. Instead of establishing presumptions or procedures that are narrowly tailored to serve the state's interest in winnowing out fraudulent claims, § 16–2342 simply imposes a blanket ban that bears no relationship to the problems of proof that appear in individual cases. This blanket ban is both underinclusive and overinclusive, since it precludes the litigation of claims in which paternity might be demonstrated without difficulty, while simultaneously permitting the litigation of suits in which problems of proof do exist.[17]

■■■ Although there is an element of arbitrariness inherent in all statutes of limitations, a closer than normal means-end fit is necessary when, as here, a statute of

---

**17.** Section 16–2342 is underinclusive because in many cases it fails to protect defendants against the problems of proof traditionally associated with delayed claims. For example, a putative father who leaves the jurisdiction before the child's second birthday will be liable to suit within 1 year of his return, regardless of the length of his absence. Similarly, under *Harris v. Kinard, supra,* a putative father who resides in the District of Columbia is not protected when an action is commenced in another jurisdiction and continued in the District of Columbia.

Conversely, § 16–2342 operates to bar suit even when paternity is either undisputed or can be readily demonstrated. *See, e.g., Lindsay v. District of Columbia ex rel. Lindsay,* 298 A.2d 211, 211–12 (D.C.1972) (history of regular support payments irrelevant if last payment occurred more than 1 year before initiation of paternity suit).

limitations burdens an "almost suspect" class [18] in such a way as to curtail its basic right to parental support. Devising a statute that addresses the problems of proof on a more individualized basis is by no means an impossible feat, as the Uniform Parentage Act, 9A U.L.A. (1973) (UPA) demonstrates.[19]

In addition to the deficiencies discussed above, § 16–2342 fails to take into account recent advances in serologic testing that in many cases obviate the need to resort to traditional methods of proving or disproving paternity. Unlike older blood testing procedures which demonstrated nonpaternity (*i.e.*, that a relatively small percentage of men could not have fathered a particular child), the newer procedures, particularly HLA testing, not only achieve a mean probability of exclusion of at least 90%, but also can affirmatively indicate the probability that a particular member of the relatively small group of nonexcluded males did father a given child. *See generally* Reisner & Bolk, *A Layman's Guide to the Use of Blood Group Analysis in Paternity Testing*, 20 J.Fam.L. 657, 673–75 (1982); Terasaki, *Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing*, 16 J.Fam.L. 543, 549–55 (1978); Maile, Jennings, Rettberg, Sell & Krause, *Joint AMA–ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage*, 10 Fam.L.Q. 247, 256 (1976). Recently we held that the results of HLA testing are admissible in evidence. *Cutchember v. Payne*, 466 A.2d 1240 (D.C.1983).

Since the accuracy of such testing techniques is unaffected by the passage of time, the problems of proof traditionally associated with paternity proceedings have been substantially reduced. Not only is it unlikely that, even years after a child's birth, an erroneous parentage determination will be made, but the vast majority of cases can be resolved without consideration of those forms of proof which may become less reliable or accurate over time. Thus, the availability and reliability of such modern testing procedures has "render[ed] more attenuated" the relationship between the 2-year limitations period and the District of Columbia's interest in preventing the prosecution of stale or fraudulent paternity claims. *Pickett, supra,* 103 S.Ct. at 2209.

■ We conclude that the 2-year limitation of action provision of § 16–2342 denies equal protection of the laws to children like those before us, who were born out of wedlock, in whose behalf suit is not brought within 2 years of their birth, and whose actions are not within either of the provisions for extending the period of limitations. We therefore declare the 2-year limitation provision of § 16–2342 to be unconstitutional. Until or unless the 2-year limitation provision of § 16–2342 is replaced by other legislation, actions for support which until now would have been barred by that provision will be governed by generally applicable 3-year statute of limitations, *see* D.C.Code § 12–301(8) (1981), and by D.C. Code § 12–302 (1981), which provides for the tolling of limitations during minority.

*Reversed and remanded.*

---

**18.** *See generally* p. 461 *supra.*

**19.** The UPA, which generally permits a child to initiate paternity proceedings until 3 years after reaching majority, establishes several rebuttable presumptions that vary the degree of difficulty that defending a paternity action will entail depending upon the circumstances of each case. The UPA represents an effort to find a satisfactory means of balancing the state's interest in seeing that children born out of wedlock have a real opportunity to establish paternity and obtain parental support, while at the same time affording putative fathers a measure of protection from stale or fraudulent claims.