*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 17-FM-588

M.D., APPELLANT,

v.

R.W., APPELLEE,

and

No. 17-FM-589

L.P., APPELLANT,

v.

M.D., APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(PCS-2050-2003)
(RSR-1525-2010)

(Hon. Rahkel Bouchet, Motion Judge)
(Hon. Julie H. Becker, Reviewing Associate Judge)

(Submitted June 25, 2018                    Decided September 27, 2018)

*Amee Vora*, *Stephanie Troyer*, and *Jonathan H. Levy*, Legal Aid Society of the District of Columbia, were on the brief for appellant M.D. in appeal No. 17-FM-588.

*Edward G. Varrone* was on the brief for appellant L.P. in appeal No. 17-FM-589.

*Amee Vora*, *Stephanie Troyer*, *Jonathan H. Levy*, and *David Carpman*, Legal Aid Society of the District of Columbia, were on the brief for appellee M.D. in appeal No. 17-FM-589.

Before FISHER, THOMPSON, and BECKWITH, *Associate Judges*.

PER CURIAM:   In Appeal No. 17-FM-588, appellant M.D. seeks review of (1) a March 15, 2017, order by an Associate Judge of the Superior Court upholding the October 14, 2016, order by a Magistrate Judge in Case No. 2003-PCS-2050 (the "paternity disestablishment case") denying a Super. Ct. Dom. Rel. R. 60 (b)(6) motion for relief from an adjudication of paternity, and (2) a May 1, 2017, order by the Associate Judge denying M.D.'s motion to amend the March 15, 2017, judgment.   In Appeal No. 17-FM-589, appellant L.P. seeks reversal of the Associate Judge's separate May 1, 2017, order denying L.P.'s motion to intervene in the paternity disestablishment case.   We hereby *sua sponte* consolidate the appeals.   For the reasons that follow, in Appeal No. 17-FM-588, we reverse and remand for further proceedings.   In Appeal No. 17-FM-589, we reverse and instruct that L.P. be permitted to intervene in the paternity disestablishment case.

**I.**

In 2003, M.D. gave birth to a daughter ("minor child" or "child") in the District of Columbia. During the month or so surrounding the child's conception, M.D. was involved in sexual relationships with appellee R.W. and with L.P. On October 24, 2003, based on M.D.'s receipt of public benefits, the District of Columbia filed a petition to establish paternity and provide support for the minor child, naming R.W. as the putative father. R.W. waived his right to genetic testing, and on April 14, 2004, the Superior Court entered an Adjudication of Paternity, i.e., an order adjudicating him the father of the minor child. The Adjudication of Paternity was signed by R.W. but not by M.D. The Superior Court entered a consent order dismissing the petition upon information that M.D. and R.W. had entered into a private agreement regarding child support.

Subsequently, M.D. (who at some point had moved to Maryland) and R.W. became involved in a paternity/child support proceeding in the Circuit Court for Prince George's County, Maryland. On June 10, 2008, the Maryland court dismissed the matter for want of prosecution upon ordering, on the basis of genetic testing, that R.W. "is **excluded** as the natural father of the minor child." On December 3, 2009, M.D. filed a petition in the Superior Court to amend the child's

birth certificate by removing R.W.'s name.[1]  The Superior Court judge, apparently unaware of the Adjudication of Paternity, granted the application the same day, on the ground that R.W. "is not the natural father" of the child.  M.D. asserts that she "believed that she had [thereby] completed all that was needed to sever any legal ties between [R.W.] and [the child]."[2]

On June 22, 2010, while M.D. still resided in Maryland, the District of Columbia filed an interstate uniform support petition against L.P. to establish

---

[1]  M.D. told the Magistrate Judge that "the courts [were] telling [her] that [she] had up to five years to . . . get [R.W.'s] . . . name removed" from the birth certificate.

[2]  As M.D.'s counsel noted during one of the hearings in the Superior Court, that court issued, on August 4, 2011, an Administrative Order (Administrative Order 11-13) that recognizes that "issues of paternity are raised when an applicant seeks to change the identity of the father listed in a birth certificate."  The Administrative Order directs that if there is no open CPO, child support order, or open Family Court case, the application to amend a birth certificate of a minor child to change the name of a parent "must be assigned for resolution to a Family Court calendar."  Administrative Order 11-13 at 1.  The Administrative Order also directs that where an issue of paternity is raised, the judge to whom the application is assigned may "order the applicant to supplement the Application by filing a Petition to Disestablish Paternity with [Family Court] Central Intake," and Central Intake must schedule a hearing before the assigned judge.  *Id.* at 2–3.  Had these procedures been in place earlier, they might have averted the situation in this case, in which the birth certificate was amended despite the still-extant Adjudication of Paternity.  M.D.'s counsel reasonably argued to the magistrate judge that Administrative Order 11-13 "is [a] recognition that *pro se* parties have been misunderstanding this amending the birth certificate process and have been using it as a means to disestablish paternity."

paternity and to collect child support, attaching M.D.'s affidavit alleging that L.P. is the biological father of the minor child. L.P. argued in opposition to the petition that the court could not establish his paternity because R.W. had been adjudged the father of the child. The District of Columbia and L.P. then filed a joint stipulation of dismissal. M.D. asserts that she did not receive notice of the hearings in the case, was not present for any of the proceedings, and was not involved in the stipulation of dismissal.

On January 5, 2016, after M.D. had moved back to the District, had begun receiving TANF benefits, and had assigned to the District of Columbia her right to collect child support, the District of Columbia filed a motion to reinstate and consolidate the cases involving R.W. and L.P. and to establish paternity for the child. The District asked the court to vacate the April 14, 2004, Adjudication of Paternity, arguing that vacatur was warranted because "there are conflicting orders regarding the paternity of the [m]inor [c]hild," with the result that "the minor child is essentially stripped of her right to seek support, as [R.W.] was adjudicated by one court to be the father of the minor child, and subsequently excluded by another court as the father of the same minor child." The District noted that L.P. had "objected to both formal and informal actions seeking to determine his biological connection to the minor child[] due to [R.W.'s] prior adjudication of paternity."

The District also requested "leave to seek the establishment of paternity and child support from [L.P.]"  The District of Columbia later withdrew from both cases, citing a "positional conflict," and the court granted M.D.'s motion to proceed in the cases on her own behalf (and with the aid of counsel) to establish paternity.

During a hearing on July 14, 2016, the court (Magistrate Judge Bouchet) stated from the bench that it would dismiss the case against L.P. because "paternity ha[d] been established [in 2004]."  The court stated that it would still hold a hearing scheduled for September 13, 2016, in the case against R.W., but expected that its decision would be the same.  Before that scheduled hearing, L.P. filed a motion to intervene in the case against R.W. in order to "protect his interests," to take an adversarial stance with respect to M.D.'s and R.W.'s desire to vacate the 2004 judgment of paternity, and to avoid the potential for inconsistent rulings.

At the September 13, 2016, hearing in the case against R.W., the court said that it would dismiss that case as well.  In an October 14, 2016, written order (entered in the docket in both cases), the court formally dismissed both cases, denied the motion to reinstate and consolidate, declined to order genetic testing of L.P., and denied the motion to disestablish paternity (which the court treated as a motion under Super. Ct. Dom. Rel. R. 60 (b)) on the grounds that neither M.D. nor

R.W. had acted with diligence and expedience and that the record revealed no extraordinary circumstances that justified their delay in seeking to vacate the Adjudication of Paternity.

M.D. sought review of the October 14, 2016, Magistrate Judge's order by an Associate Judge. Before the Associate Judge, L.P. renewed his motion to intervene (on which the Magistrate Judge had not ruled), asked the court to consolidate the cases, and later filed a motion for limited access to the records in the paternity disestablishment case.

On February 24, 2017, the Associate Judge affirmed the October 14, 2016, ruling. The Associate Judge found persuasive M.D.'s argument that her *pro se* action in 2009 to have the child's birth certificate amended should be treated as a motion to disestablish paternity, but reasoned that even that "motion" was not filed within a reasonable time after M.D. became aware of the 2008 genetic testing results supporting her 2016 effort to disestablish paternity. The court also rejected M.D.'s claim of hardship, reasoning that it was far from clear that she suffered extreme hardship "during the past six years while her efforts to collect support lay dormant," and that she could still pursue child support from R.W.

On May 1, 2017, the Associate Judge denied M.D.'s motion to amend the February 24, 2017, ruling (which the court recognized, based on its substance, could properly be treated as a Rule 59 (e) motion citing alleged errors of law). The Associate Judge rejected M.D.'s argument that the Magistrate Judge had erred by failing to consider the factors identified in *Wylie v. Glenncrest*, 143 A.3d 73 (D.C. 2016) (the "Rule 60 (b)(6) factors"),[3] reasoning that M.D made this argument for the first time in the motion to amend and that, in any event, it is not apparent that these factors are required considerations when a litigant seeks relief from a judgment that was entered on the merits. The Associate Judge also rejected M.D.'s arguments that extreme hardship warranted relief from the judgment and found that "[t]he record in this case . . . does not reflect [extraordinary] circumstances." In a separate order issued on May 1, 2017, the Associate Judge denied L.P.'s motion to intervene and to consolidate, but granted him limited access to the records in the paternity disestablishment case. These appeals followed.

---

[3] I.e., "whether the [Rule 60 (b)(6)] movant (1) had actual notice of the proceedings, (2) acted in good faith, (3) took prompt action, [and] (4) made a prima facie showing of an adequate defense, and (5) whether vacatur would prejudice the non-moving party." *Id.* at 84.

M.D. argues that the Superior Court erred by failing to analyze the Rule 60 (b)(6) factors and also "improperly analyzed whether [M.D.] acted within a reasonable time and in the face of extraordinary circumstances." L.P. argues that the Superior Court erred in denying his motion for intervention because he satisfies the requirements for intervention as of right under Super. Ct. Dom. Rel. R. 24 (a)(2) and has a legally protectable interest in the paternity disestablishment action.

## II.

Upon a party's motion "made within a reasonable time," the Superior Court may "relieve a party . . . from a final judgment[] [or] order" for "any . . . reason justifying relief from the operation of the judgment."[4] Super. Ct. Dom. Rel. R. 60 (b)(6). "[W]hat constitutes a reasonable time under Rule 60 (b) depends upon the circumstances of each case, including both the cause and consequences of the delay." *Carrasco v. Thomas D. Walsh, Inc.*, 988 A.2d 471, 476 (D.C. 2010) (internal quotation marks omitted) (explaining that "in deciding whether [the

---

[4] "Because [Super. Ct. Dom. Rel. R. 60 (b)(6)] is identical in all material respects to the corresponding civil rule . . . we shall not differentiate between the two in this opinion." *See Cruz v. Sarmiento*, 737 A.2d 1021, 1023 n.1 (D.C. 1999).

movant] should be penalized for not moving more expeditiously . . . , it makes sense to consider . . . whether and to what extent the non-movant would be prejudiced by granting the movant's request for relief."). "Rule 60 (b)(6) is properly invoked in extraordinary circumstances or where a judgment may work an extreme and undue hardship, but is not narrowly defined." *Miranda v. Contreras*, 754 A.2d 277, 280 (D.C. 2000) (internal quotation marks omitted).

We review the denial of a Rule 60 (b) motion (including an Associate Judge's order upholding the denial of a Rule 60 (b)(6) motion) for abuse of discretion. *See Onyeneho v. Allstate Ins. Co.*, 80 A.3d 641, 644 (D.C. 2013); *M.M. v. T–M.M.*, 995 A.2d 164, 166 (D.C. 2010). Although ordinarily review of denial of a Rule 59 (e) motion is for abuse of discretion, *Associated Estates LLC. v. BankAtlantic*, 164 A.3d 932, 936 (D.C. 2017), "our review is *de novo* when the [trial] court considers and rejects a legal argument." *Zuza v. Office of the High Representative*, 857 F.3d 935, 938 n.3 (D.C. Cir. 2017).

"Where the trial court's ruling on a motion to intervene as of right involves a question of law, appellate review is *de novo*, while to the extent the ruling is based on questions of fact, it is ordinarily reviewed for abuse of discretion." *HSBC Bank*

*USA, N.A. v. Mendoza*, 11 A.3d 229, 233–34 (D.C. 2010) (internal quotation marks and alterations omitted).

**III.**

For a number of reasons, we decline to resolve this appeal on the basis of whether the Superior Court erred by failing to consider the Rule 60 (b)(6) factors. For one thing, our review of the record confirms that M.D. raised the issue for the first time in her motion to amend. We also are inclined to agree with the Associate Judge (although we decline to definitively decide) that the Rule 60 (b)(6) factors articulated in *Wylie* are most apposite in cases in which judgment has been entered without a determination on the merits. And, in any event, while it is true that the Associate Judge did not articulate or expressly apply those factors in determining whether to uphold denial of the Rule 60 (b)(6) motion, she did consider record facts relevant to those factors. For example, the Associate Judge acknowledged that M.D. might not have known about the Adjudication of Paternity at the time it

was entered;[5] treated M.D.'s knowledge about the genetic testing and the resultant Maryland order confirming that R.W. is not the biological father as the starting point for prompt action by M.D. to disestablish R.W.'s paternity and to pursue L.P. for child support; cited, in considering the merits of M.D.'s motion, a decision from this court (*M.M.*, *supra*) that affirmed the denial of a motion to disestablish paternity despite DNA evidence excluding the movant as the father; acknowledged that the question of child support from R.W. remained open; and vacated the portion of the Magistrate Judge's ruling that "d[id] not belong in this action, to which [L.P.] is not a party." Thus, to a great degree in conformity with the Rule 60 (b)(6) factors, the Associate Judge did consider when M.D. had actual notice of the relevant proceedings; whether she acted in good faith to avoid what she now claims are hardships; whether she took prompt action; whether she had an adequate legal argument that relief from the Adjudication of Paternity was warranted; and what the impact of the Magistrate Judge's ruling would be on R.W. and L.P., the non-moving parties in these cases.

We nevertheless conclude that a remand is warranted because, as M.D. argues and as we explain below, the Associate Judge did not adequately analyze all

---

[5] M.D. claimed throughout the proceedings on her motion that she lacked actual notice of the Adjudication of Paternity until the March 11, 2016, hearing.

of the hardship factors M.D. cited and whether M.D. acted within a reasonable time. In addition, the court seems to have conflated the requirement to show extraordinary circumstances with the requirement to show timely action, requiring that extraordinary circumstances have "justif[ied] the delay."

In addressing M.D.'s claims of hardship, the Associate Judge did not adequately consider the consequences to the child of denying the motion for relief from the Adjudication of Paternity. M.D. claimed to be motivated by her desire to sever the relationship between the child and R.W. — who she represented has never been active in the child's life — because R.W. is "dangerous" and M.D. does not want him around the child. M.D. also asserted (in her opposition to L.P.'s motion to intervene) that her move to Maryland was to "escape [R.W.'s] abuse" and that R.W. "was arrested in Maryland in 2006 for assaulting [M.D.][] and pled guilty to second-degree assault." For his part, R.W. repeatedly expressed his resentment towards M.D., and the Magistrate Judge remarked on the "volatile" nature of the parties' in-court interactions.

Despite this record, in addressing in the February 24, 2017, order M.D.'s argument that leaving the paternity judgment in place created extreme hardship, the Associate Judge considered only whether there would be hardship from the

lack of child support. The Associate Judge did not adequately consider M.D.'s argument that leaving the paternity adjudication in place created a continuing potential for R.W., who allegedly has a history of intrafamily violence,[6] to have custody of and exercise decision-making with respect to the care and custody of a child with whom he had no biological relationship and (it appears from the record) no history of care or supervision,[7] especially if M.D. were to die or become incapacitated. The Associate Judge was obligated to consider whether the risk

---

[6] *See* D.C. Code § 16-1001 (8), (9) (2012 Repl.) (defining the term "intrafamily offense" to include "intrafamily violence" and defining "intrafamily violence" to include "a criminal offense that is committed . . . upon a person . . . with whom the offender has a child in common"); *see also id.* § 16-914 (a)(2) ("There shall be a rebuttable presumption that joint custody is not in the best interest of the child . . . if a judicial officer finds by a preponderance of the evidence that an intrafamily offense as defined in § 16-1001(8) . . . has occurred.").

[7] The Associate Judge did consider that hardship in denying the Rule 59 (e) motion, but incorrectly reasoned that this would be "at issue in *any* case involving misidentification of a child's father." This case — in which there is no evidence that R.W. has ever had a relationship with the child — is in stark contrast to *M.M.*, where the movant was the adjudicated father with whom the child had spent time over occasional weekends, during overnight visits to the movant's parents' home, and during a month in the summer. 995 A.2d at 165.

This case is also unlike *M.M.* in other important ways. In *M.M.*, the adjudicated father asked the court to vacate an adjudication of paternity twelve years after it was entered, during which passage of time the child's mother had died, thus disadvantaging the child and her caretakers in their efforts to "identify[] the true biological father." *Id.* at 167. Further, the movant appeared to be motivated by the fact that "he had fallen behind in support payments and was named in [a] neglect proceeding." *Id.* at 166–67.

from this potential consequence warranted a liberal application of the Rule 60 (b) "within a reasonable time" standard.

As noted above, we have said that "what constitutes a reasonable time under Rule 60 (b) depends upon the circumstances of each case" and have emphasized that whether a movant "should be penalized for not moving more expeditiously" depends on "whether and to what extent the non-movant would be prejudiced by granting the movant's request for relief." *Carrasco*, 988 A.2d at 476 (internal quotation marks omitted). Thus, regardless of whether M.D. was slow to act in her efforts to disestablish R.W.'s paternity, "in deciding whether [she] should be penalized for not moving more expeditiously" to set aside the Adjudication of Paternity, the Associate Judge was obligated to consider whether there was prejudice to R.W. (and L.P.). There appears to be no dispute that vacating the paternity adjudication would not prejudice R.W., who indicated throughout the proceedings that he wanted the court to vacate the adjudication. Further, treating L.P. as a party in interest, on the present record we can discern no unfair prejudice to L.P. (who, as the Associate Judge observed in denying his motion to intervene, if he is the biological father, "has benefited financially for thirteen years from the adjudication [of R.W.'s paternity] — based on incorrect information, as it turns out" and "has avoided being held liable for supporting [the] child").

The Superior Court also required M.D. to show not only that the motion for relief was made within a reasonable time, but also the existence of "extraordinary circumstances . . . that justify the delay," which is not the correct standard. Relief under Rule 60 (b)(6) does require "extraordinary circumstances" or "extreme and undue hardship" arising out of a judgment, *Miranda*, 754 A.2d at 280, but we have not required that the delay in seeking relief be the result of an extraordinary circumstance. Further, there is an extraordinary circumstance in this case, i.e., the existence of conflicting court orders relating to paternity, an "unusual . . . situation[]" that may "justify[] an exception to the overriding policy of finality," *Clement v. District of Columbia Dep't of Human Servs.*, 629 A.2d 1215, 1219 (D.C. 1993), if the other relevant considerations are satisfied.[8] To be clear, especially when there are conflicting orders concerning paternity, we reject the rule articulated by the Magistrate Judge, that "when paternity is established, th[e] [c]ourt [in all cases] is precluded from then re-litigating an issue that has already been established."

---

[8] *Cf. Miller v. Charles*, 439 S.E.2d 88, 90 (Ga. Ct. App. 1993) ("Biological evidence points overwhelmingly toward Miller as the father of the child, and . . . giving the [prior] adjudication against Glaze preclusive effect would perpetuate not simply an inconsistency, but more probably a falsehood and an injustice.").

For the foregoing reasons, we conclude that the proper disposition is to vacate the Superior Court's order upholding the denial of the Rule 60 (b) motion, and to remand for further consideration by the Superior Court in light of this court's flexible approach toward "reasonable time."

**IV.**

L.P. seeks to participate in the proceedings on remand, arguing that he has a right to intervene under Super. Ct. Dom. Rel. R. 24 (a)(2).[9] That rule states that intervention "shall be permitted" if (1) the applicant "timely" files a motion to intervene, (2) the applicant "claims an interest relating to the subject of the action," and (3) "the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest," *unless* (4) the interest is "adequately represented by existing parties." Super. Ct. Dom. Rel. R. 24 (a)(2). Our cases construing *Civil* Rule 24 (a)(2) — which, like the federal equivalent, is

---

[9] L.P.'s original motion to intervene also argued for permissive intervention under Super. Ct. Dom. Rel. R. 24 (b), but he did not reassert that contention in his renewed motion to intervene or in this appeal.

substantially similar to *Domestic Relations* Rule 24 (a)(2) — interpret the rule "liberally." *HSBC Bank*, 11 A.3d at 233.

We begin by assessing whether L.P. has proffered an adequate interest — a term this court has read "broad[ly]." *McPherson v. District of Columbia Hous. Auth.*, 833 A.2d 991, 994 (D.C. 2003). Beyond requiring the applicant to identify an interest that is "legally protectable," *HSBC Bank*, 11 A.3d at 234, we have "eschew[ed] any attempt precisely to define the nature of the 'interest' required for intervention," *Calvin-Humphrey v. District of Columbia*, 340 A.2d 795, 798 (D.C. 1975). Instead, we have adopted a "flexible and practical approach," *id.* at 798–99, allowing "our construction [to] be guided by the policies behind the 'interest' requirement" — namely, the principle that the "'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process," *id.* at 799 (quoting *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967)). Here, L.P. has satisfied this test. He asserts an interest in not bearing the obligations of fatherhood for a child he asserts is not his. That interest clearly relates to the subject of M.D.'s action, which concerns the paternity of her child. Indeed, as one of only two people M.D. identified as a possible father to her daughter, L.P. bears a

highly particularized interest in the disestablishment suit — litigation that, if successful, could cut the list of putative fathers to one.

L.P.'s interest is legally protectable.  While the statutes governing paternity determinations mainly exist to protect "the child's welfare," *District of Columbia ex rel. W.J.D. v. E.M.*, 467 A.2d 457, 465 (D.C. 1983), they also recognize the due process interests of putative fathers.  *See, e.g.*, D.C. Code § 16-2341 (b) (2012 Repl.) (stating that in cases to establish paternity, court shall appoint attorney to "represent the respondent" when court "deems it necessary and proper"); *id.* § 16-2343 (a) (listing restrictions on court's ability to require medical or genetic testing).  The statutes thus encompass L.P.'s interest in a court not naming him the father of a child he contends is not his.  Moreover, L.P.'s interest is not, as M.D. asserts, merely an economic one; that characterization trivializes the moral duties that come with fatherhood — obligations that a judicial determination of parentage would, in effect, impute to L.P., even if he is not eager to fulfill them.

Although additional steps must be taken to prove that L.P. is the child's father, the disestablishment action could "as a practical matter impair or impede" L.P.'s ability to protect his interest.  Super. Ct. Dom. Rel. R. 24 (a)(2).  "To satisfy

this element . . . , [L.P.] must show only that impairment of [his] substantial legal interest is possible if intervention is denied[,] [a] burden [that] is minimal." *HSBC Bank*, 11 A.3d at 235 (quoting *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1253 (10th Cir. 2001)). Here, if M.D. obtains relief from the Adjudication of Paternity, L.P. would lose what amounts to a shield from future liability. M.D. essentially concedes this point in her brief in the Rule 60 (b) appeal, as she states that "the trial court . . . cited the Adjudication of Paternity as the basis for dismissing [the] action against [L.P.] . . . . The Adjudication thus prevents [the child] from obtaining child support from her biological father . . . ."[10] Moreover, the D.C. Code imposes impediments to compelling L.P. to undergo a genetic test as long as the Adjudication of Paternity remains effective.[11] *See* D.C. Code § 16-2343 (a)(2), (4) (discussing limits on court's ability to order medical or genetic testing when "[a] legal finding of paternity has been made" or when a child

---

[10] In making this point, M.D. emphasized the importance of allowing her daughter to "establish and maintain a relationship with her biological father." This argument undercuts her assertion that it would be speculative to assume that she would file a paternity action against L.P. upon stripping R.W. of his status as the legal father.

[11] This observation demonstrates the limits of M.D.'s argument — made in her brief opposing intervention — that L.P. cannot contest a parentage action by asserting a collateral estoppel defense predicated on the Adjudication of Paternity. Even if he cannot use the Adjudication to argue issue preclusion, L.P. could still rely on it to raise other challenges to a paternity test, such as ones predicated on § 16-2343 (a).

has a "presumed parent"); *see also* D.C. Code § 16-909 (a)(4) (stating that a presumption of paternity exists where "the putative father has acknowledged paternity in writing"). If M.D. succeeds in disestablishing R.W.'s paternity, then she would *directly* strip L.P. of these defenses to genetic testing—and, as she appears to concede, such testing would be central to any future action to establish L.P. as the child's father. *See* Appellant M.D.'s Br. at 35, *M.D. v. R.W.*, No. 17-FM-588 (stating that "the only thing standing in the way of genetic testing and the likely identification of [the child's] biological father is the Adjudication of Paternity itself"). Thus, the *R.W.* action threatens to expose L.P. to a liability from which he currently enjoys substantial safeguards.

The trial court effectively concluded, and M.D. essentially argues, that any harm to L.P is speculative because, even if the disestablishment suit succeeds, M.D. (or the District) would need to initiate a separate action to establish that L.P. is the father. In particular, M.D. urges us to hold that a court may not allow intervention where the applicant's interest is in avoiding a potential liability that "remains contingent on a separate legal action." She derives this rule primarily from federal cases concerning insurance disputes. Yet, as one case she cites explains, this rule exists partly to avoid opening the door to any entity that "might anticipate a benefit from a judgment in favor of one of the parties." *See Flying J.,*

*Inc. v. Van Hollen*, 578 F.3d 569, 571 (7th Cir. 2009); *see also Restor-A-Dent Dental Labs., Inc. v. Certified Alloy Prods., Inc.*, 725 F.2d 871, 876 (2d Cir. 1984). Allowing L.P. to intervene does not pose such a risk because, as noted, he and R.W. are the only men who M.D. asserts could be her child's father.

Nor is the rule that she urges one that federal courts have uniformly followed. For example, in *Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 314–15 (D.C. Cir. 2015), the FEC declined to investigate a complaint against a nonprofit corporation and, when the complainant challenged that decision in district court, the D.C. Circuit allowed the nonprofit corporation to intervene to protect its interest in the decision. The district court could not, itself, impose liability on the corporation. *Id.* at 315. At most, it could remand the complaint to the agency; a judgment would not be entered against the corporation unless the Commission subsequently voted to file a civil enforcement action and then prevailed in that suit. *Id.* at 315–16, 318. The long road to liability was not determinative, the D.C. Circuit explained, because the possibility that the district court case could "extinguish the current barrier to enforcement" provided a sufficient basis for intervention. *Id.* at 319. Here, the circumstances are similar: L.P. benefits from a paternity adjudication that protects him from subsequent

liability; "[w]hatever the ultimate outcome, [L.P.] has a concrete stake in the favorable [adjudication] currently in place." *Id.*

Turning to the final two considerations, neither the trial court nor M.D. questioned the timeliness of L.P.'s motion to intervene. Nor did either suggest that R.W. or M.D. could adequately represent L.P.'s interest. Such a position would be meritless, as M.D. seeks to establish L.P. rather than R.W. as the child's legal father and R.W. supports that result. Indeed, if L.P. does not intervene, then no party will oppose M.D.'s motion, let alone "adequately represent[]" L.P.'s interests. These circumstances, on their own, strongly counsel in favor of allowing L.P. to participate in the proceedings on remand. *See Calvin-Humphrey*, 340 A.2d at 800 (noting that in suit where taxpayer sought to intervene to defend position abandoned by the District government, "the focus . . . should not be on a rigid definition of the interest required . . . but on the adequacy of representation afforded by municipal authorities"); 6 James Wm. Moore et al., *Moore's Federal Practice* § 24.03[2][a] (3d ed. 2018) ("[P]ractical application of Rule 24(a)(2) involves a balancing and blending of the independent components.").

In reaching our holding today, we recognize that the case law on intervention is complicated and does not always yield rules that can easily be

applied to all circumstances. But these doctrinal challenges arise from real-world necessities. Rule 24 "attempts to address" the "wide variety of situations" in which a nonparty seeks to intervene. *United States v. Tex. E. Transmission Corp.*, 923 F.2d 410, 412 (5th Cir. 1991). Consequently, "it is often true that 'general rules and past decisions cannot provide uniformly dependable guides.'" *Id.* (quoting *Smuck v. Hobson*, 408 F.2d 175, 179 (D.C. Cir. 1969) (en banc)). Due in part to this reality, our case law mandates a "practical approach" to intervention issues. *Calvin-Humphrey*, 340 A.2d at 799. Applying it here, we hold that L.P. has a right to intervene in *M.D. v. R.W.*, No. 2003 PCS 2050, and that the trial court erred as a matter of law by holding that he could not do so.

For the reasons discussed above, we reverse the judgment that is the subject of Appeal No. 17-FM-588 and remand for further proceedings. We also reverse the judgment that is the subject of Appeal No. 17-FM-589 and instruct that L.P. be permitted to intervene in the paternity disestablishment case.

*So ordered.*