PICKETT ET AL. *v.* BROWN ET AL.

No. 82–5576.   Argued April 27, 1983—Decided June 6, 1983

2

BRENNAN, J., delivered the opinion for a unanimous Court.

*Harold W. Horne,* by appointment of the Court, 459 U. S. 1100, argued the cause and filed a brief for appellants.

*Susan Short Kelly,* Assistant Attorney General of Tennessee, argued the cause for appellees. With her on the brief were *William M. Leech, Jr.,* Attorney General, and *Robert B. Littleton.**

---

*James D. Weill, Marian Wright Edelman,* and *Judith L. Lichtman* filed a brief for the Children's Defense Fund et al. as *amici curiae* urging reversal.

JUSTICE BRENNAN delivered the opinion of the Court.

This case requires us to decide the constitutionality of a provision of a Tennessee statute[1] that imposes a 2-year limitations period on paternity and child support actions brought on behalf of certain illegitimate children.

## I

Under Tennessee law both fathers and mothers are responsible for the support of their minor children. See Tenn. Code Ann. § 34–101 (1977); *Rose Funeral Home, Inc.* v. *Julian*, 176 Tenn. 534, 539, 144 S. W. 2d 755, 757 (1940); *Brooks* v. *Brooks*, 166 Tenn. 255, 257, 61 S. W. 2d 654 (1933). This duty of support is enforceable throughout the child's minority. See *Blackburn* v. *Blackburn*, 526 S. W. 2d 463, 466 (Tenn. 1975); *Whitt* v. *Whitt*, 490 S. W. 2d 159, 160 (Tenn. 1973). See also Tenn. Code Ann. §§ 36–820, 36–828 (1977). Tennessee law also makes the father of a child born out of wedlock responsible for "the necessary support and education of the child." § 36–223. See also *Brown* v. *Thomas*, 221 Tenn. 319, 323, 426 S. W. 2d 496, 498 (1968). Enforcement of this obligation depends on the establishment of paternity. Tennessee Code Ann. § 36–224(1) (1977)[2] provides for the fil-

---

[1] Tennessee Code Ann. § 36–224(2) (1977) reads as follows:

"(2) Proceedings to establish the paternity of the child and to compel the father to furnish support and education for the child may be instituted during the pregnancy of the mother or after the birth of the child, but shall not be brought after the lapse of more than two (2) years from the birth of the child, unless paternity has been acknowledged by the father in writing or by the furnishing of support. Provided, however, that the department of human services or any person shall be empowered to bring a suit in behalf of any child under the age of eighteen (18) who is, or is liable to become a public charge."

[2] Tennessee Code Ann. § 36–224(1) (1977) reads as follows:

"(1) A petition to establish paternity of a child, to change the name of the child if it is desired, and to compel the father to furnish support and education for the child in accordance with this chapter may be filed by the mother, or her personal representative, or, if the child is likely to become a public charge by the state department of human services or by any person. Said petition may be filed in the county where the mother or child resides

4

ing of a petition which can lead both to the establishment of paternity and to enforcement of the father's duty of support. With a few exceptions, however, the petition must be filed within two years of the child's birth. See § 36–224(2); n. 1, *supra*.

In May 1978, Frances Annette Pickett filed an action pursuant to § 36–224(1) seeking to establish that Braxton Brown was the father of her son, Jeffrey Lee Pickett, who was born on November 1, 1968. App. 3. Frances Pickett also sought an order from the court requiring Brown to contribute to the support and maintenance of the child. *Ibid.* Brown denied that he was the father of the child. *Id.*, at 13. It is uncontested that he had never acknowledged the child as his own or contributed to the child's support. *Id.*, at 5–6, 13–14; Brief for Appellants 5. Brown moved to dismiss the suit on the ground that it was barred by the 2-year limitations period established by § 36–224(2). Frances Pickett responded with a motion challenging the constitutionality of the limitations period. App. 5–7, 13.[3]

The Juvenile Court held that the 2-year limitations period violated the Equal Protection Clause of the Fourteenth

---

or is found or in the county where the putative father resides or is found. The fact that the child was born outside this state shall not be a bar to filing a petition against the putative father. After the death of the mother or in case of her disability said petition may be filed by the child acting through a guardian or next friend."

[3] Frances Pickett challenged the statute on equal protection and due process grounds under both the Federal and State Constitutions. App. 6–7. She also alleged that the statute amounted to cruel and unusual punishment under both the Federal and State Constitutions. *Ibid.* The Juvenile Court did not address this claim. The Tennessee Supreme Court later noted that she did not seriously press it before that court. 638 S. W. 2d 369, 371 (1982). She also does not advance it before this Court.

Pickett also sought permission to amend her complaint to bring the paternity suit in the name of her child. App. 6.

After Pickett filed her motion challenging the constitutionality of the statute the State Attorney General was notified and he intervened to defend the statute. See *id.*, at 13; 638 S. W. 2d, at 371.

Amendment of the Federal Constitution and certain provisions of the Tennessee Constitution. *Id.*, at 14. The court based its conclusion on the fact that the limitations period governing paternity actions imposed a restriction on the support rights of some illegitimate children that was not imposed on the identical rights of legitimate children. *Ibid.* Without articulating any clear standard of review, the court rejected the State's argument that the 2-year limitations period was justified by the State's interest in preventing the litigation of "stale or spurious" claims. *Id.*, at 15. In the court's view, this argument was undermined by the exception to the limitations period established for illegitimate children who are, or are likely to become, public charges, for "the possibilities of fraud, perjury, or litigation of stale claims [are] no more inherent in a case brought [for] a child who is not receiving public assistance than [in] a case brought for a child who is a public charge." *Ibid.*[4]

On appeal,[5] the Tennessee Supreme Court reversed the judgment of the Juvenile Court and upheld the constitutionality of the 2-year limitations period. 638 S. W. 2d 369 (1982). In addressing Frances Pickett's equal protection and due process challenges to the statute, the court first reviewed our decision in *Mills* v. *Habluetzel*, 456 U. S. 91 (1982), and several decisions from other state courts. Based on this review, the court stated that the inquiry with respect to both claims was "essentially the same: whether the state's policy as

---

[4] The court also found that the statute discriminated between "children born out of wedlock who are receiving public assistance and such children whose mothers are not receiving public assistance." App. 15–16. In this regard, the court pointed out that a mother's fulfillment of her obligation to support her child does not relieve the father of his duty of support. *Id.*, at 16.

The court granted Pickett permission to amend her complaint to bring the suit in the name of her child. *Ibid.*

[5] The Juvenile Court "allowed an interlocutory appeal by certifying that the constitutionality of [Tenn. Code Ann.] § 36–224(2) was the sole determinative question of law in the proceedings." 638 S. W. 2d, at 371.

reflected in the statute affords a fair and reasonable opportunity for the mother to decide in a rational way whether or not the child's best interest would be served by her bringing a paternity suit." 638 S. W. 2d, at 376. The court concluded that "[t]he Legislature could rationally determine that two years is long enough for most women to have recovered physically and emotionally, and to be able to assess their and their children's situations logically and realistically." *Id.*, at 379.

The court also found that the 2-year statute of limitations was substantially related to the State's valid interest in preventing the litigation of stale or fraudulent claims. *Id.*, at 380. The court justified the longer limitations period for illegitimates who are, or are likely to become, public charges, on the ground that "[t]he state's countervailing interest in doing justice and reducing the number of people on welfare is served by allowing the state a longer time during which to sue." *Ibid.* The court also suggested that "the Tennessee statute is 'carefully tuned' to avoid hardship in predictable groups of cases, since it contains an exception for actions against men who have acknowledged their children in writing or by supporting them, and it has been held that . . . regular or substantial payments are not required in order to constitute 'support.'" *Id.*, at 379 (footnote omitted). Finally, the court found that the uniqueness of the limitations period in not being tolled during the plaintiff's minority did not "alone requir[e] a holding of unconstitutionality of a two-year period, as opposed to any other period which can end during the plaintiff's minority." *Id.*, at 380.[6]

---

[6] The court also rejected the due process challenge to the statute. *Id.*, at 376, 380.

In addition, the court found that the Juvenile Court had committed a harmless error, from which Brown and the State did not appeal, in allowing Pickett "to amend her complaint to add the name of the child, by the mother as next friend, as a plaintiff." *Id.*, at 380. The court stated that § 36–224(1) "does not permit an action to be brought by the child except in case of death or disability of the mother." *Ibid.*

We noted probable jurisdiction.   459 U. S. 1068 (1982).
We reverse.

## II

We have considered on several occasions during the past 15 years the constitutional validity of statutory classifications based on illegitimacy.   See, *e. g.*, *Mills* v. *Habluetzel, supra; United States* v. *Clark,* 445 U. S. 23 (1980); *Lalli* v. *Lalli,* 439 U. S. 259 (1978); *Trimble* v. *Gordon,* 430 U. S. 762 (1977); *Mathews* v. *Lucas,* 427 U. S. 495 (1976); *Jimenez* v. *Weinberger,* 417 U. S. 628 (1974); *New Jersey Welfare Rights Org.* v. *Cahill,* 411 U. S. 619 (1973); *Gomez* v. *Perez,* 409 U. S. 535 (1973); *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972); *Glona* v. *American Guarantee & Liability Insurance Co.,* 391 U. S. 73 (1968); *Levy* v. *Louisiana,* 391 U. S. 68 (1968).   In several of these cases, we have held the classifications invalid.   See, *e. g.*, *Mills* v. *Habluetzel, supra; Trimble* v. *Gordon, supra; Jimenez* v. *Weinberger, supra; New Jersey Welfare Rights Org.* v. *Cahill, supra; Gomez* v. *Perez, supra; Weber* v. *Aetna Casualty & Surety Co., supra; Glona* v. *American Guarantee & Liability Insurance Co., supra; Levy* v. *Louisiana, supra.*   Our consideration of these cases has been animated by a special concern for discrimination against illegitimate children.   As the Court stated in *Weber:*

"The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage.   But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing.   Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent.   Courts are powerless to prevent the

social opprobrium suffered by these hapless children, but the Equal Protection Clause does enable us to strike down discriminatory laws relating to status of birth where—as in this case—the classification is justified by no legitimate state interest, compelling or otherwise." 406 U. S., at 175–176 (footnotes omitted).

In view of the history of treating illegitimate children less favorably than legitimate ones, we have subjected statutory classifications based on illegitimacy to a heightened level of scrutiny. Although we have held that classifications based on illegitimacy are not "suspect," or subject to "our most exacting scrutiny," *Trimble* v. *Gordon, supra,* at 767; *Mathews* v. *Lucas,* 427 U. S., at 506, the scrutiny applied to them "is not a toothless one . . . ." *Id.,* at 510. In *United States* v. *Clark, supra,* we stated that "a classification based on illegitimacy is unconstitutional unless it bears 'an evident and substantial relation to the particular . . . interests [the] statute is designed to serve.'" 445 U. S., at 27. See also *Lalli* v. *Lalli, supra,* at 265 (plurality opinion) ("classifications based on illegitimacy . . . are invalid under the Fourteenth Amendment if they are not substantially related to permissible state interests"). We applied a similar standard of review to a classification based on illegitimacy last Term in *Mills* v. *Habluetzel,* 456 U. S. 91 (1982). We stated that restrictions on support suits by illegitimate children "will survive equal protection scrutiny to the extent they are substantially related to a legitimate state interest." *Id.,* at 99.

Our decisions in *Gomez* and *Mills* are particularly relevant to a determination of the validity of the limitations period at issue in this case. In *Gomez* we considered "whether the laws of Texas may constitutionally grant legitimate children a judicially enforceable right to support from their natural fathers and at the same time deny that right to illegitimate children." 409 U. S., at 535. We stated that "a State may not invidiously discriminate against illegitimate children by denying them substantial benefits accorded children generally,"

*id.*, at 538, and held that "once a State posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because its natural father has not married its mother." *Ibid.* The Court acknowledged the "lurking problems with respect to proof of paternity," *ibid.*, and suggested that they could not "be lightly brushed aside." *Ibid.* But those problems could not be used to form "an impenetrable barrier that works to shield otherwise invidious discrimination." *Ibid.*

In *Mills* we considered the sufficiency of Texas' response to our decision in *Gomez.* In particular, we considered the constitutionality of a 1-year statute of limitations governing suits to identify the natural fathers of illegitimate children. 456 U. S., at 92. The equal protection analysis focused on two related requirements: the period for obtaining paternal support has to be long enough to provide a reasonable opportunity for those with an interest in illegitimate children to bring suit on their behalf; and any time limit on that opportunity has to be substantially related to the State's interest in preventing the litigation of stale or fraudulent claims. *Id.*, at 99–100.

The Texas statute failed to satisfy either requirement. The 1-year period for bringing a paternity suit did not provide illegitimate children with an adequate opportunity to obtain paternal support. *Id.*, at 100. The Court cited a variety of factors that make it unreasonable to require that a paternity suit be brought within a year of a child's birth. *Ibid.*[7] In addition, the Court found that the 1-year limita-

---

[7] The Court suggested that "[f]inancial difficulties caused by childbirth expenses or a birth-related loss of income, continuing affection for the child's father, a desire to avoid disapproval of family and community, or the emotional strain and confusion that often attend the birth of an illegitimate child all encumber a mother's filing of a paternity suit within 12 months of birth." 456 U. S., at 100. The Court also pointed out that "[e]ven if the

tions period was not "substantially related to the State's interest in avoiding the prosecution of stale or fraudulent claims." *Id.*, at 101. The problems of proof surrounding paternity suits do not "justify a period of limitation which so restricts [support rights] as effectively to extinguish them." *Ibid.* The Court could "conceive of no evidence essential to paternity suits that invariably will be lost in only one year, nor is it evident that the passage of 12 months will appreciably increase the likelihood of fraudulent claims." *Ibid.* (footnote omitted).[8]

In a concurring opinion, JUSTICE O'CONNOR, joined by four other Members of the Court,[9] suggested that longer limitations periods also might be unconstitutional. *Id.*, at 106.[10] JUSTICE O'CONNOR pointed out that the strength of the State's interest in preventing the prosecution of stale or fraudulent claims was "undercut by the countervailing state interest in ensuring that genuine claims for child support are satisfied." *Id.*, at 103. This interest "stems not only from a desire to see that 'justice is done,' but also from a desire to reduce the number of individuals forced to enter the welfare rolls." *Ibid.* (footnote omitted). JUSTICE O'CONNOR also

---

mother seeks public financial assistance and assigns the child's support claim to the State, it is not improbable that 12 months would elapse without the filing of a claim." *Ibid.* In this regard, the Court noted that "[s]everal months could pass before a mother finds the need to seek such assistance, takes steps to obtain it, and is willing to join the State in litigation against the natural father." *Ibid.* (footnote omitted).

[8] The Court found no need to reach a due process challenge to the statute. *Id.*, at 97.

[9] THE CHIEF JUSTICE, JUSTICE BRENNAN, and JUSTICE BLACKMUN joined JUSTICE O'CONNOR's concurring opinion. *Id.*, at 102. JUSTICE POWELL joined Part I of JUSTICE O'CONNOR's concurring opinion, but did not join the Court's opinion. *Id.*, at 106 (POWELL, J., concurring in judgment).

[10] JUSTICE O'CONNOR wrote separately because she feared that the Court's opinion might "be misinterpreted as approving the 4-year statute of limitation now used in Texas." *Id.*, at 102.

suggested that the State's concern about stale or fraudulent claims "is substantially alleviated by recent scientific developments in blood testing dramatically reducing the possibility that a defendant will be falsely accused of being the illegitimate child's father." *Id.*, at 104, n. 2. Moreover, JUSTICE O'CONNOR found it significant that a paternity suit was "one of the few Texas causes of action not tolled during the minority of the plaintiff." *Id.*, at 104 (footnote omitted). She stated:

> "Of all the difficult proof problems that may arise in civil actions generally, paternity, an issue unique to illegitimate children, is singled out for special treatment. When this observation is coupled with the Texas Legislature's efforts to deny illegitimate children any significant opportunity to prove paternity and thus obtain child support, it is fair to question whether the burden placed on illegitimates is designed to advance permissible state interests." *Id.*, at 104–105.

Finally, JUSTICE O'CONNOR suggested that "practical obstacles to filing suit within one year of birth could as easily exist several years after the birth of the illegitimate child." *Id.*, at 105. In view of all these factors, JUSTICE O'CONNOR concluded that there was "nothing special about the first year following birth" that compelled the decision in the case. *Id.*, at 106.

Against this background, we turn to an assessment of the constitutionality of the 2-year statute of limitations at issue here.

### III

Much of what was said in the opinions in *Mills* is relevant here, and the principles discussed in *Mills* require us to invalidate this limitations period on equal protection grounds.[11]

---

[11] In this light, we need not reach Pickett's due process challenge to the statute.

Although Tennessee grants illegitimate children a right to paternal support, Tenn. Code Ann. § 36–223 (1977), and provides a mechanism for enforcing that right, § 36–224(1), the imposition of a 2-year period within which a paternity suit must be brought, § 36–224(2), restricts the right of certain illegitimate children to paternal support in a way that the identical right of legitimate children is not restricted. In this respect, some illegitimate children in Tennessee are treated differently from, and less favorably than, legitimate children.

Under *Mills*, the first question is whether the 2-year limitations period is sufficiently long to provide a reasonable opportunity to those with an interest in illegitimate children to bring suit on their behalf. 456 U. S., at 99. In this regard, it is noteworthy that § 36–224(2) addresses some of the practical obstacles to bringing suit within a short time after the child's birth that were described in the opinions in *Mills*. See 456 U. S., at 100; *id.*, at 105–106 (O'CONNOR, J., concurring). The statute creates exceptions to the limitations period if the father has provided support for the child or has acknowledged his paternity in writing. The statute also allows suit to be brought by the State or by any person at any time prior to a child's 18th birthday if the child is, or is liable to become, a public charge. See n. 1, *supra*. This addresses JUSTICE O'CONNOR's point in *Mills* that a State has a strong interest in preventing increases in its welfare rolls. 456 U. S., at 103–104 (concurring opinion). For the illegitimate child whose claim is not covered by one of the exceptions in the statute, however, the 2-year limitations period severely restricts his right to paternal support. The obstacles to filing a paternity and child support suit within a year after the child's birth, which the Court discussed in *Mills*, see *id.*, at 100; n. 7, *supra*, are likely to persist during the child's second year as well. The mother may experience financial difficulties caused not only by the child's birth, but also by a loss of income attributable to the need to care for the child. Moreover, "continuing affection for the child's father, a desire to

avoid disapproval of family and community, or the emotional strain and confusion that often attend the birth of an illegitimate child," 456 U. S., at 100, may inhibit a mother from filing a paternity suit on behalf of the child within two years after the child's birth. JUSTICE O'CONNOR suggested in *Mills* that the emotional strain experienced by a mother and her desire to avoid family or community disapproval "may continue years after the child is born." *Id.*, at 105, n. 4 (concurring opinion).[12] These considerations compel a conclusion that the 2-year limitations period does not provide illegitimate children with "an adequate opportunity to obtain support." *Id.*, at 100.

The second inquiry under *Mills* is whether the time limitation placed on an illegitimate child's right to obtain support is substantially related to the State's interest in avoiding the litigation of stale or fraudulent claims. *Id.*, at 99–100. In this case, it is clear that the 2-year limitations period governing paternity and support suits brought on behalf of certain illegitimate children does not satisfy this test.

First, a 2-year limitations period is only a small improvement in degree over the 1-year period at issue in *Mills*. It, too, amounts to a restriction effectively extinguishing the support rights of illegitimate children that cannot be justified by the problems of proof surrounding paternity actions. As was the case in *Mills*, "[w]e can conceive of no evidence essential to paternity suits that invariably will be lost in only

---

[12] Problems stemming from a mother's emotional well-being are of particular concern in assessing the validity of Tennessee's limitations period because § 36–224(1), see n. 2, *supra*, permits suit to be filed only by the mother or by her personal representative if the child is not likely to become a public charge. As the Tennessee Supreme Court stated, § 36–224(1) "does not permit an action to be brought by the child except in case of death or disability of the mother." 638 S. W. 2d, at 380. The Texas statute involved in *Mills* permitted suit to be brought by " 'any person with an interest in the child' . . . ." 456 U. S., at 100. See also Tr. of Oral Arg. 31–33.

[two years], nor is it evident that the passage of [24] months will appreciably increase the likelihood of fraudulent claims." *Id.*, at 101 (footnote omitted).

Second, the provisions of § 36–224(2) undermine the State's argument that the limitations period is substantially related to its interest in avoiding the litigation of stale or fraudulent claims. As noted, see *supra*, at 6, § 36–224(2) establishes an exception to the statute of limitations for illegitimate children who are, or are likely to become, public charges. Paternity and support suits may be brought on behalf of these children by the State or by any person at any time prior to the child's 18th birthday. The State argues that this distinction between illegitimate children receiving public assistance and those who are not is justified by the State's interest in protecting public revenue. See Brief for Appellee Leech 26–30. Putting aside the question of whether this interest can justify such radically different treatment of two groups of illegitimate children,[13] the State's argument does not address the different treatment accorded illegitimate children who are not receiving public assistance and legitimate children. This difference in treatment is allegedly justified by the

---

[13] The State unquestionably has a legitimate interest in protecting public revenue. As JUSTICE O'CONNOR pointed out in *Mills*, however, the State also has an interest in seeing that " 'justice is done' " by "ensuring that genuine claims for child support are satisfied." 456 U. S., at 103 (concurring opinion). Moreover, an illegitimate child has an interest not only in obtaining paternal support, but also in establishing a relationship to his father. As the Juvenile Court suggested in this case, these interests are not satisfied merely because the mother is providing the child with sufficient support to keep the child off the welfare rolls. App. 16. See n. 4, *supra*. The father's duty of support persists even under these circumstances. App. 16. See also *Rose Funeral Home, Inc.* v. *Julian*, 176 Tenn. 534, 539, 144 S. W. 2d 755, 757 (1940); *Brooks* v. *Brooks*, 166 Tenn. 255, 257, 61 S. W. 2d 654 (1933). In any event, we need not resolve this tension in this case. As we discuss *infra*, the State's interest in protecting the public revenue does not make paternity claims any more or less stale or vulnerable to fraud.

State's interest in preventing the litigation of stale or fraudulent claims. But as the exception for children receiving public assistance demonstrates, the State perceives no prohibitive problem in litigating paternity claims throughout a child's minority. There is no apparent reason why claims filed on behalf of illegitimate children who are receiving public assistance when they are more than two years old would not be just as stale, or as vulnerable to fraud, as claims filed on behalf of illegitimate children who are not public charges at the same age. The exception in the statute, therefore, seriously undermines the State's argument that the different treatment accorded legitimate and illegitimate children is substantially related to the legitimate state interest in preventing the prosecution of stale or fraudulent claims and compels a conclusion that the 2-year limitations period is not substantially related to a legitimate state interest.

Third, Tennessee tolls most actions during a child's minority. See Tenn. Code Ann. § 28–1–106 (1980).[14] In *Parlato* v. *Howe*, 470 F. Supp. 996 (ED Tenn. 1979), the court stated that "[t]he legal disability statute represents a long-standing policy of the State of Tennessee to protect potential causes of actions by minors during the period of their minority." *Id.*, at 998–999. In view of this policy, the court held that a statute imposing a limitations period on medical malpractice actions "was not intended to interfere with the operation of the legal disability statute." *Id.*, at 998. Accord, *Braden* v. *Yoder*, 592 S. W. 2d 896 (Tenn. App. 1979). But see *Jones* v. *Black*, 539 S. W. 2d 123 (Tenn. 1976) (1-year limitations

---

[14] Tennessee Code Ann. § 28–1–106 (1980) reads as follows:

"If the person entitled to commence an action is, at the time the cause of action accrued, either within the age of eighteen (18) years, or of unsound mind, such person, or his representatives and privies, as the case may be, may commence the action, after the removal of such disability, within the time of limitation for the particular cause of action, unless it exceed *[sic]* three (3) years, and in that case within three (3) years from the removal of such disability."

period governing wrongful-death actions applies "regardless of the minority or other disability of any beneficiary of the action"). Many civil actions are fraught with problems of proof, but Tennessee has chosen to overlook these problems in most instances in favor of protecting the interests of minors. In paternity and child support actions brought on behalf of certain illegitimate children, however, the State instead has chosen to focus on the problems of proof and to impose on these suits a short limitations period. Although the Tennessee Supreme Court stated that the inapplicability of the tolling provision to paternity actions did not "alone" require invalidation of the limitations period, 638 S. W. 2d, at 380, it is clear that this factor, when considered in combination with others already discussed, may lead one "to question whether the burden placed on illegitimates is designed to advance permissible state interests." *Mills* v. *Habluetzel*, 456 U. S., at 105 (O'CONNOR, J., concurring). See also *id.*, at 106 (POWELL, J., concurring in judgment).[15]

---

[15] There is some confusion about the relationship between § 28–1–106 and § 36–224. Compare Brief for Appellants 18; Tr. of Oral Arg. 10, 13, with Brief for Appellee Leech 13–14, 18; Tr. of Oral Arg. 30–31, 37–38. Even assuming that the limitations period in § 36–224(2) is tolled during the mother's minority, the important point is that it is not tolled during the minority of the child. As noted, see *supra*, at 15, and n. 14, statutes of limitations generally are tolled during a child's minority. This certainly undermines the State's argument that the different treatment accorded legitimate and illegitimate children is justified by its interest in preventing the litigation of stale or fraudulent claims.

It is not critical to this argument that the right to file a paternity action generally is given to the mother. It is the child's interests that are at stake. The father's duty of support is owed to the child, not to the mother. See Tenn. Code Ann. § 36–223 (1977). Moreover, it is the child who has an interest in establishing a relationship to his father. This reality is reflected in the provision of § 36–224(1) that allows the child to bring suit if the mother is dead or disabled. Cf. S. Rep. No. 93–1356, p. 52 (1974) ("[T]he interest primarily at stake in [a] paternity action [is] that of the child"). Restrictive periods of limitation, therefore, necessarily affect the interests of the child and their validity must be assessed in that light.

Finally, the relationship between a statute of limitations and the State's interest in preventing the litigation of stale or fraudulent paternity claims has become more attenuated as scientific advances in blood testing have alleviated the problems of proof surrounding paternity actions. As JUSTICE O'CONNOR pointed out in *Mills*, these advances have "dramatically reduc[ed] the possibility that a defendant will be falsely accused of being the illegitimate child's father." *Id.*, at 104, n. 2 (concurring opinion). See *supra*, at 10–11. See also *Little* v. *Streater*, 452 U. S. 1, 6–8, 12, 14 (1981). Although Tennessee permits the introduction of blood test results only in cases "where definite exclusion [of paternity] is established," Tenn. Code Ann. § 36–228 (1977); see also § 24–7–112 (1980), it is noteworthy that blood tests currently can achieve a "mean probability of exclusion [of] at least . . . 90 percent . . . ." Miale, Jennings, Rettberg, Sell, & Krause, Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage, 10 Family L. Q. 247, 256 (1976).[16] In *Mills*, the Court rejected the argument that recent advances in blood testing negated the State's interest in avoiding the prosecution of stale or fraudulent claims. 456 U. S., at 98, n. 4. It is not inconsistent with this view, however, to suggest that advances in blood testing render more attenuated the relationship between a statute of limitations and the State's interest in preventing the prosecution of stale or fraudulent paternity claims. This is an appropriate consideration in determining whether a

---

[16] See also Stroud, Bundrant, & Galindo, Paternity Testing: A Current Approach, 16 Trial 46 (Sept. 1980) ("Recent advances in scientific techniques now enable the properly equipped laboratory to routinely provide attorneys and their clients with a 95–98 percent probability of excluding a man falsely accused of paternity"); Terasaki, Resolution By HLA Testing of 1000 Paternity Cases Not Excluded By ABO Testing, 16 J. Family L. 543 (1978). See generally Ellman & Kaye, Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?, 54 N. Y. U. L. Rev. 1131 (1979).

18

period of limitations governing paternity actions brought on behalf of illegitimate children is substantially related to a legitimate state interest.

## IV

The 2-year limitations period established by Tenn. Code Ann. § 36–224(2) (1977) does not provide certain illegitimate children with an adequate opportunity to obtain support and is not substantially related to the legitimate state interest in preventing the litigation of stale or fraudulent claims. It therefore denies certain illegitimate children the equal protection of the laws guaranteed by the Fourteenth Amendment. Accordingly, the judgment of the Tennessee Supreme Court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*