THE PEOPLE *ex rel.* MARIA KELLY, Plaintiff-Appellee, v. ANTHONY PASKO, Defendant-Appellant.

First District (2nd Division)   No. 1—88—350

Opinion filed May 30, 1989.

Patrick A. Tuite and Brent D. Stratton, both of Tuite, Mejia & Giacchetti, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Caroline O. Schoenberger, Leonard N. Foster, and Eugene S. Kraus, Assistant State's Attorney, of counsel), for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant appeals from a jury's verdict that he is the father of plaintiff's child arguing that (1) the trial court erred in ruling that the action was not barred by the statute of limitations; (2) paternity was not proved by a preponderance of the evidence; and (3) he was denied a fair trial by the admission of statistical blood test results and the child's birth certificate into evidence, as well as gestures and facial expressions plaintiff made during trial.

Plaintiff gave birth to her daughter on May 23, 1977, and on December 28, 1982, she executed a paternity complaint that alleged defendant is the father. The instant proceeding was filed on August 15, 1983. On June 28, 1984, the trial judge denied defendant's motion to dismiss, in which he argued that plaintiff's action was barred by the statute of limitations. On October 24, 1984, the judge ordered plaintiff, her daughter and defendant to undergo blood tests, which were performed on October 29, 1984.

At trial, plaintiff testified that defendant was the principal at the elementary school where she taught. Plaintiff began teaching at the school in September 1971, and she had a business relationship with defendant until December 1974, when they began "going out." She stated that they went out for drinks approximately once a month until May 1975, when they began to have sexual intercourse. They frequented the Chicago American Motel, located on Mannheim Road in Melrose Park and the Regal 8 Motel, also on Mannheim Road, but beginning in September 1975 they had intercourse two or three times a week, usually on Tuesdays, Thursdays and Saturdays, in plaintiff's home.

Plaintiff testified that her relationship with defendant began to deteriorate in August 1980, when she asked him to help support their daughter. He responded by threatening to reassign plaintiff to a less desirable classroom, although she had received excellent or superior ratings from defendant prior to that time. In June 1981 she re-

ceived a rating of unsatisfactory for the school year 1980-81, and she was transferred to another, "more difficult" school in September 1981.

Plaintiff told only her mother and her baby-sitter about her relationship with defendant. Her mother died prior to trial, and the trial judge barred the testimony of the sitter because she testified in a *voir dire* held outside the presence of the jury that she could not positively identify the man plaintiff was dating in 1975-76.

Plaintiff denied having sexual intercourse with anyone except defendant between July and October 1976, and stated that her daughter was conceived in August 1976. She told defendant that she was pregnant with his child on September 30, 1976, and he responded that it was her problem and that he would pay for nothing, although he later offered to pay for an abortion or, alternatively, suggested plaintiff place the child for adoption. Plaintiff testified that defendant brought items and gave her money for the baby, and that he purchased stock in the baby's name.

Plaintiff further testified that defendant had a scar from a hernia operation on his right side, and she admitted that in her deposition she had said that she could not remember on which side the scar was located. She also admitted that other teachers at the school could have known about the scar because defendant had the operation shortly before his father's wake in 1978, and that teachers attending the wake would have known about the operation.

On cross-examination, plaintiff conceded that she knew of no witnesses who could corroborate the fact that she and defendant had been at the tavern, restaurant or motel to which she had testified going with defendant; that the Chicago American Motel had been sold and that no guest registration records were available; that she did not know if any attempts had been made to locate such records from the Regal 8 Motel; that she had never talked with any of her neighbors to determine if any of them had seen defendant go into her house between 1975 and 1981; and that none of her four children had ever seen defendant at their home.

Edward Kelly, plaintiff's ex-husband, is listed as the child's father on her baptismal certificate; however, plaintiff claims that a church employee listed him as the father. The employee died prior to trial. Plaintiff listed Edward Kelly as the father on her daughter's school registration, completed in February 1982, because he is listed as the father of her other children. She did not list a father's name on the birth certificate, but did list the age of the father as 50 years old. Edward was approximately 36 years old at the time of the baby's

birth and defendant was approximately 50 years old. The results of the blood tests exclude Edward as the child's father; however, she calls Edward "daddy," and plaintiff has not dissuaded her from doing so.

The trial court ordered that Clare Wong, a medical technologist who supervised the blood tests, would be allowed to testify as to the results of the tests and the similarities between defendant's blood and the baby's as indicated by a specific test, but she was not allowed to "tie them all together" and testify as to the probability that defendant is the child's father. Wong then testified that plaintiff has Type 0 blood and that both defendant and plaintiff's daughter have Type B blood; she also explained the index results for each of 16 blood systems. For example, the paternity index for the ABO system was 7.9595, meaning that defendant was close to eight times more likely to be the father compared to a random man. Wong also gave her opinion that the test results did not exclude defendant as the biological father.

Defendant testified that he had four children and had been divorced since the spring of 1980. He denied ever having sexual intercourse with plaintiff or giving her money for her child. After the birth of the child, he and his wife brought baby items to plaintiff. On occasion he loaned plaintiff $5 or $10, which she repaid, and at times he gave her a ride to school when her car would not start; she did the same for him.

Defendant stated that during August 1976 he had a severe attack of bursitis in his shoulder and was also taking medication for allergies and that both conditions made it more difficult for him to have sex as well as lessened his interest in doing so.

He also stated that he had an indentation in his chest, which he had since birth. During cross-examination, plaintiff had testified that, other than the hernia scar, she did not know of any other physical abnormality of the defendant; however, after defendant testified regarding his indentation, she testified in rebuttal that her daughter also had such a malformed chest.

The jury returned a finding of paternity against defendant. The trial court denied defendant's motion for judgment notwithstanding the verdict and ordered that defendant pay child support in the amount of $300 per month. Defendant now appeals.

OPINION

■ Defendant begins with the argument that the trial court erred in denying his motion to dismiss based on the running of the

statute of limitations, and claims that the retroactive application of the extended statute of limitations currently in effect unconstitutionally deprived him of his property right in and to a time bar.

At the time of plaintiff's daughter's birth, the applicable statute of limitations provided in part: "No [paternity] action may be brought after the expiration of 2 years from the birth of the child." (Ill. Rev. Stat. 1977, ch. 40, par. 1354.) Under this statute, a paternity suit on behalf of the child would have been barred after May 23, 1979; however, the statute was held to be unconstitutional (*Dornfeld v. Julian* (1984), 104 Ill. 2d 261, 472 N.E.2d 431; *Jude v. Morrissey* (1983), 117 Ill. App. 3d 782, 454 N.E.2d 24) after the Supreme Court invalidated similar statutes in cases from Texas (*Mills v. Habluetzel* (1982), 456 U.S. 91, 71 L. Ed. 2d 770, 102 S. Ct. 1549) and Tennessee (*Pickett v. Brown* (1983), 462 U.S. 1, 76 L. Ed. 2d 372, 103 S. Ct. 2199). Accordingly, the following legislative enactment became effective July 1, 1985:

> "An action brought by or on behalf of a child shall be barred if brought later than 2 years after the child reaches the age of majority; however, if the action on behalf of the child is brought by a public agency, it shall be barred 2 years after the agency has ceased to provide assistance to the child." Ill. Rev. Stat. 1985, ch. 40, par. 2508.

In *Dornfeld*, plaintiff filed a paternity suit against Julian on August 11, 1981, alleging that he was the father of her child born on June 19, 1978. Defendant moved to dismiss the action, relying on the two-year statute of limitations then in effect; however, while the case was pending in the trial court, the Supreme Court "held a Tennessee paternity statute containing a two-year limitation period unconstitutional because it denied equal protection to children born of unwed parents in obtaining parental support." (104 Ill. 2d at 264, citing *Pickett v. Brown* (1983), 462 U.S. 1, 76 L. Ed. 2d 372, 103 S. Ct. 2199.) The trial court then ruled the two-year limitation in the Illinois Paternity Act (Ill. Rev. Stat. 1981, ch. 40, par. 1354) to be unconstitutional but held the balance of the Act to be valid and denied defendant's motion to dismiss. This became the issue before the supreme court, and, in upholding the trial court, it stated:

> "[W]e are unpersuaded by the defendant's argument that the legislature intended to create a cause of action only if the two-year time limit were operative. ***
>
> The Paternity Act provides for the paternal support, maintenance and education of children born of unwed parents, thereby converting a father's moral obligation of support into

a legal one, and preventing such children from becoming public charges. [Citation.] Without the two-year limitation, the Paternity Act is constitutional and meets these objectives. These policy considerations indicate that the legislature intended the Paternity Act to remain a valid statute, even with the limitation period in section 4 excised.

\* \* \*

\*\*\* [T]he period of limitation for an action brought by or on behalf of a child under the new act [Ill. Rev. Stat. 1985, ch. 40, par. 2508] has been extended to two years after the child reaches the age of majority. [Citation.]

Although the new act will not become effective until July 1, 1985, it is appropriate for us to construe the present statute with an eye toward the clearly expressed present intent of the legislature [citations], and to avoid creating an unnecessary inconsistency in the law. Finally, we choose to avoid the judicial inefficiency as well as the denigration of a clearly stated public policy that would result from now dismissing this and similar causes, only to have them reinstated next July under the greatly extended limitation period of the new act." 104 Ill. 2d at 266-67.

In denying defendant's motion to dismiss in the instant case, the trial judge stated:

"Well, the problem is that I read the [s]upreme [c]ourt decision as protective of the rights of children. \*\*\* That—this is why they have, apparently by dictum or alternate dictum, enumerated the policy that the statute of limitations, barring the claim of paternity made on behalf of a child has no existence because an illegitimate child isn't going to have a period of limitations. I believe [that] to be the import of the [s]upreme court decision \*\*\*."

Defendant argues that *Dornfeld* is not controlling and does not require that the extended limitation, provided for in section 8 (Ill. Rev. Stat. 1985, ch. 40, par. 2508), be applied to him. He maintains that the *Dornfeld* court failed to consider "Illinois' long-standing prohibition against reviving previously barred causes of action" and "the policy justifications for the previous [2-year] statute of limitations," and he argues that applying the extended limitation in this case will deprive him of his vested property right in a limitations defense without due process. *Wilson v. All-Steel, Inc.* (1981), 87 Ill. 2d 28, 428 N.E.2d 489; *Markley v. Kavanagh* (1986), 140 Ill. App. 3d 737, 489 N.E.2d 384; *Board of Education v. Blodgett* (1895), 155 Ill. 441,

40 N.E. 1025.

Plaintiff responds that Illinois courts have held that the extended limitations period applies to actions pending at the time the Parentage Act of 1984 became effective, such as the one at bar. (*People ex rel. Moore v. McIntosh* (1985), 134 Ill. App. 3d 1070, 481 N.E.2d 833.) In that case, the trial court dismissed the paternity complaint, filed in 1983, on behalf of a child born in 1978. The appellate court reversed, stating:

> "We believe, however, that to uphold a dismissal of the instant action for lack of timely filing would abrogate the expressed intent of the legislature made apparent within the new Illinois Parentage Act of 1984, effective July 1, 1985, which provides that an action brought by or on behalf of a child may be brought up to two years after the child reaches majority, and if brought by a public agency on behalf of the child, it may be filed within two years after the agency has ceased providing public financial assistance. (Ill. Rev. Stat. 1984 Supp., ch. 40, par. 2508.) We believe that the policy articulated in *Dornfeld v. Julian* [citation], in which the supreme court upheld a paternity action despite the unconstitutionality of part of the statute authorizing the action, should control our disposition here." 134 Ill. App. 3d at 1073-74.

Plaintiff asserts that defendant is urging this court to overrule *Dornfeld*, an action this court cannot consider.

Plaintiff also contends that defendant did not have a vested right in the two-year limitations period, because that statute was held unconstitutional and was therefore invalid at the time the complaint was filed. She further argues that *Blodgett* does not prevent retroactive application of the extended limitations, because the courts have recognized a legislative intent to allow such application.

Our supreme court has applied the extended limitations period in a case filed long before that statute became effective, in order to effectuate the clearly expressed intent of the legislature to provide children born of unwed parents up to 20 years in which to enforce their right to support in a paternity action. Just as "the policy articulated in *Dornfeld*" controlled the disposition in *Moore*, it controls here; therefore, we hold that the trial court properly ruled that plaintiff's action is not barred by the statute of limitations.

■ Defendant next argues that the evidence was insufficient to support a finding of paternity, claiming that plaintiff's testimony was uncorroborated by any other evidence and that there were contradictions and factual discrepancies in her testimony. He emphasizes that

the hotel they allegedly frequented cannot produce records of registered guests; that two of the witnesses who would corroborate plaintiff's testimony are deceased; that plaintiff presented no witnesses who had seen them out socially or had seen defendant enter her home; that plaintiff listed her ex-husband as the child's father on both her baptismal certificate and her school registration; that although the child was born in 1977, plaintiff delayed filing her complaint until shortly after defendant gave her a negative review at work; that during her deposition testimony plaintiff could not recall on which side defendant's hernia scar was located; and that plaintiff failed to mention defendant's chest indentation in her testimony on both direct and cross-examination. Accordingly, defendant contends, since the jury was instructed to consider the results of the blood tests only if they found that defendant had sexual intercourse with plaintiff at the time her daughter was conceived, the blood tests do not corroborate plaintiff's testimony that she had intercourse with defendant.

Plaintiff responds that a judgment notwithstanding the verdict should be entered "only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand" (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504), and that this is not such a case. It is for the jury to resolve questions of the credibility of witnesses and the weight to be given their testimony (*People ex rel. Johnson v. Hampton* (1979), 70 Ill. App. 3d 555, 388 N.E.2d 782), and the jury's findings will not be reversed unless they are clearly erroneous. (*Watkins v. Martin* (1983), 115 Ill. App. 3d 417, 450 N.E.2d 866.) The function of a reviewing court is to determine whether the result reached in the trial court was one which is reasonable on the facts in evidence, and not to substitute its judgment for that of the trier of fact. *Burge v. Morton* (1981), 99 Ill. App. 3d 266, 425 N.E.2d 539.

Neither plaintiff's nor defendant's testimony was corroborated, and, after observing the witnesses and hearing all the evidence, the jury chose to believe plaintiff. Their verdict is reasonable and must be affirmed.

Finally, defendant argues that the trial court erred in allowing Wong to testify as to the statistical results of the blood tests and in admitting into evidence the child's birth certificate. In ruling on defendant's motion *in limine* regarding the test results, the trial court stated;

"My ruling is basically that in your [Wong's] opinion, you are not to refer to any percentage of probability of whether this man is a putative father here could be the child's natural father.

\* \* \*

I am going to prevent you from giving your opinion that he is the father within 99 point whatever the percentage may be. In this case it's under—it's 99.95.

MR. TUITE: 99.96.

THE COURT: So, I am telling you now, if you say that, I am going to strike it from the record and ask the jury to disregard it.

\* \* \*

Out of the [16] tests she can. Explain out of the [16] tests, how rare that gene is. How, that's what we said you can do. But see, what I said you couldn't do is when you tie them all together and take one plus a fraction to the nineteenth power. That's how she gets that big number. And I am not going to let you do that.

\* \* \*

So she can testify to the rarity of that trait so far as the index is concerned. Where I object is where we get to the—we tie it together; and that's how you come up with the 99."

Wong testified that a paternity index is "the estimation of the man's chance of paternity in comparison to the chance of paternity of a random man of the same ethnic population in terms of the individual's possibility of passing a sperm containing the gene that is required to be the biological father." The paternity indexes were as follows: ABO:7.9595; HLA:48.1608; ESP:5.1026; MNSs:1.6322; Rh:1.1694; Kell:1.0471; Duffy System:0.9984; Kidd:0.9328; AcP:1.8295; PGM1:1.3297; GLO:2.3416; ESD:5.10261; H.p:2.3983; Gc:1.7576; TSF:1.0061; GM:2.8571; and Km:1.1186.

■ Defendant maintains that the trial judge ruled that Wong could not testify as to the probability results derived from the paternity indexes and that Wong's testimony was in violation of this order. We do not agree with defendant's interpretation of the judge's ruling. He clearly stated that he would allow Wong to explain the paternity indexes, but would not permit her to tell the jury the percentage of probability, which came to nearly 100%, that defendant is the father. Wong clearly complied with this order.

Defendant also asserts that the trial judge improperly allowed such testimony. He relies on *People v. Harbold* (1984), 124 Ill. App.

3d 363, 464 N.E.2d 734, in support of his argument that such statistical evidence is more prejudicial than probative and should not have been admitted. In that case, the results of a genetic marker analysis of blood samples prepared from stained physical evidence, such as clothing, was used to connect defendant to a murder. The appellate court noted that there was "a *bona fide* scientific dispute" as to the reliability of these tests and ruled that the trial court erred in admitting the results, stating, "Not every useful investigative tool is necessarily admissible in a criminal trial." (124 Ill. App. 3d at 379.) However, the court stated that it was not holding that such tests were "unreliable as a matter of law." 124 Ill. App. 3d at 381.

Plaintiff contends that Wong's testimony was proper under the Paternity Act, which provides in part as follows:

"(d) Expert opinion interpreting the [blood] test results shall be admissible in evidence.

(e) If the experts' opinions or the test results exclude paternity of the alleged father, he is presumed not to be the father, and such presumption must be rebutted by clear and convincing evidence. Disagreement among experts as to the results of blood tests shall not, of itself, render the experts' opinions inadmissible into evidence." Ill. Rev. Stat. 1987, ch. 40, par. 2511.

Defendant has presented no authority to this court to suggest that an expert is not allowed to explain blood test results to the jury. Without an explanation as to what the results mean, the blood test would be useless in a paternity suit. Simply being told that the HLA index was 48.1608, without explaining that such a result indicates that defendant is 48 times more likely to be the biological father compared to the random man, would not contribute to the jury's understanding of the facts in the case; therefore, the trial court properly admitted Wong's explanation of the results into evidence.

▮ Defendant also complains that the child's birth certificate, which did not identify a father but listed his age as 50, should not have been admitted into evidence. He maintains that allowing such evidence effectively circumvents the prohibition against identifying a father on a birth certificate in cases where the mother and father are not married and the father has not consented to having his name entered on the birth certificate. (Ill. Rev. Stat. 1987, ch. 111½, par. 73—12.) Again, he fails to cite any authority to this court.

*Ashford v. Ziemann* (1984), 99 Ill. 2d 353, 459 N.E.2d 940, clearly supports plaintiff in her argument that the birth certificate was properly introduced into evidence. In that case, the supreme

court held that a birth certificate which did not list a father but did list his age was admissible in a paternity action, to prove that there was a live birth of a child out of wedlock, an essential element in a paternity action. (99 Ill. 2d at 363.) The court also rejected the argument that such evidence was hearsay, noting that the plaintiff had supplied the information on the birth certificate and she was available and subject to cross-examination.

Defendant also contends that he was denied a fair trial by the faces and gestures plaintiff made during trial. During the trial, and in response to such conduct of plaintiff, defense counsel requested that she be instructed to stop and that she be required to sit in the audience section of the courtroom during closing arguments. He also complained about her gesturing to indicate to the jury that she was aware of the indentation in defendant's chest, although defense counsel later stated that any negative impact had been cured. The trial judge responded by instructing plaintiff accordingly and stating that he would watch her during closing arguments. Defendant cites no authority in support of his argument that this court should reverse the jury verdict because of plaintiff's conduct. Moreover, during the trial he did not request a mistrial, which would seem to indicate that he did not think her actions were seriously prejudicing him. Whatever faces or gestures she may have made do not constitute a sufficient basis for reversal in this case.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BILANDIC, P.J., and EGAN,* J., concur.

---

*Justice Egan participated in the decision of this case prior to joining the sixth division.