*180
 
 OPINION OF THE COURT
 

 Wesley, J.
 

 Felicita Luna, a New York resident, twice went to the courts of Connecticut requesting a declaration that Dennis Dobson is the father of her child. As a result of a series of missteps by the Connecticut Attorney General, her champion in each matter, both proceedings were dismissed without ever hearing Luna’s claims. In this New York paternity proceeding the child’s putative father seeks to invoke one of the Connecticut proceedings as a total bar. We conclude that on these particular facts, under Connecticut law, that proceeding does not preclude Luna’s New York claim. Thus, the Full Faith and Credit Clause does not serve as an impenetrable barrier to a paternity petition in New York.
 

 In October 1994, Luna filed a paternity petition naming Dob-son as the father of her two-month-old daughter and requiring him to pay child support and medical expenses. The paternity petition was transferred to Connecticut, Dobson’s residence, pursuant to the Uniform Support of Dependents Law.
 
 [1]
 
 On April 3, 1995, a Connecticut Magistrate ordered that New York schedule blood tests for the parties, and warned that the petition would be dismissed if the tests were not completed by July 10, 1995. The New York City Law Department’s Family Court Division (the New York Office) notified Luna of the order and instructed her and her daughter to appear for blood tests at a designated time. In a similar letter, the New York Office requested that the Connecticut Support Enforcement Division
 
 *181
 
 (the Connecticut Office) contact Dobson and require him to appear for testing in Connecticut. Luna and her daughter were tested as scheduled. Dobson, however, was not tested; the Connecticut Office misplaced the New York Office’s letter and failed to notify Dobson of his scheduled test.
 

 On July 10, 1995, a Connecticut Assistant Attorney General represented Luna before the same Magistrate. Although the Connecticut Office had received notification of the scheduled blood tests from New York, the Assistant Attorney General was not aware of this essential fact. Dobson moved to dismiss the petition with prejudice for failure to comply with the Magistrate’s order. Over the Assistant Attorney General’s objection, the Magistrate granted Dobson’s motion and dismissed the petition with prejudice.
 

 The Assistant Attorney General moved for a rehearing after learning that the Connecticut Office had, in fact, timely received notification of the dates and times for the blood test. He argued that the New York Office complied with the court’s initial order and that, but for the Connecticut Office’s error in misplacing the scheduling letter, the court would not have dismissed the petition. Despite this unrefuted argument, the Magistrate nonetheless denied the motion without explanation. The Assistant Attorney General appealed the Magistrate’s decision on Luna’s behalf. Almost two years later, the Connecticut Superior Court dismissed the appeal for failure to prosecute.
 

 A second paternity petition was filed in New York and transferred to Connecticut in 1997. Dobson filed an objection before a second Magistrate asserting that the second petition was barred on res judicata grounds. The same Assistant Attorney General represented Luna. Rather than contest Dob-son’s objection or point out that the first dismissal was entirely unwarranted, the Assistant Attorney General requested a dismissal, noting only that the first petition and subsequent appeal had been dismissed.
 
 [2]
 
 In the face of no resistance from the Assistant Attorney General, the Magistrate dismissed the second petition.
 

 
 *182
 
 Thereafter, the New York Office commenced this proceeding on Luna’s behalf in New York.
 
 [3]
 
 Dobson moved to dismiss, based only on Connecticut’s dismissal of the first petition with prejudice. Luna opposed the motion, arguing that New York courts should not give full faith and credit to the Connecticut dismissal.
 

 The Hearing Examiner initially granted Dobson’s motion to dismiss. Luna successfully moved for reargument and renewal. On reconsideration, the Hearing Examiner vacated the prior order and reinstated the petition. The parties were then ordered to submit to blood tests that ultimately determined to a 99.97% probability that Dobson is the child’s father.
 

 Family Court denied Dobson’s objections and affirmed the Hearing Examiner’s decision to reinstate the paternity petition. Dobson appealed and the Appellate Division unanimously reversed (274 AD2d 518). The court held that the doctrine of res judicata and fall faith and credit barred Luna from prosecuting this proceeding because the Connecticut court dismissed the earlier proceeding with prejudice. We now reverse.
 

 Luna argues that New York is not required to accord full faith and credit to the judgment because she was denied due process in the Connecticut proceeding. Dobson contends that the Connecticut proceeding passed the due process test. He points to the dismissal “with prejudice” to conclude that Luna’s claim was dismissed on the merits and, therefore, precluded in New York. In our view, however, Connecticut law would not give this Connecticut judgment preclusive effect.
 

 Article IV, § 1 of the United States Constitution requires that the public acts, records and judicial proceedings of each State should be given full faith and credit in every other State. The purpose of the Full Faith and Credit Clause is to avoid conflicts between States in adjudicating the same matters, functioning to “weld the independent States into a Nation”
 
 (Matter of Farmland Dairies v Barber,
 
 65 NY2d 51, 55,
 
 rearg denied
 
 65 NY2d 924). In a practical sense, full faith and credit establishes a rule of evidence requiring recognition of a prior
 
 *183
 
 out-of-State judgment, giving it res judicata effect and “thus avoiding relitigation of issues in one State which have already been decided in another”
 
 (id.).
 

 Under the Full Faith and Credit Clause a “ ‘judgment of a state court should have the same credit, validity, and effect, in every other court of the United States, which it had in the state where it was pronounced’ ”
 
 (Underwriters Natl. Assur. Co. v North Carolina Life & Acc. & Health Ins. Guar. Assn.,
 
 455 US 691, 704 [citation omitted];
 
 see also, Kremer v Chemical Constr. Corp.,
 
 456 US 461, 462-463;
 
 Farmland Dairies, supra,
 
 65 NY2d, at 55-56). Thus, New York is only required to give the same preclusive effect to the Connecticut judgment that Connecticut would under its law.
 
 [4]
 

 In Connecticut “[u]nder the doctrine of res judicata, or claim preclusion, a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action on the same claim”
 
 (State v Aillon,
 
 189 Conn 416, 423-424, 456 A2d 279, 283,
 
 cert denied
 
 464 US 837). The doctrine of claim preclusion “bars not only subsequent relitigation of a claim previously asserted, but subsequent relitigation of ‘any claims relating to the same cause of action which were actually made or which might have been made’”
 
 (Isaac v Truck Serv.,
 
 253 Conn 416, 421, 752 A2d 509, 512 [citing
 
 Orselet v DeMatteo,
 
 206 Conn 542, 545, 539 A2d 95, 97]). Connecticut has recognized, however, “that the mere explication of the doctrine of claim preclusion does not resolve all difficulties which may appear at the point of application”
 
 (State v Ellis,
 
 197 Conn 436, 463, 497 A2d 974, 988). “As was stated long ago, the ‘law of estoppel by judgment is well settled, the only difficulty being in its application to the facts’”
 
 (id.,
 
 197 Conn, at 463-464, 497 A2d, at 988-989 [citing
 
 Pelham Hall Co. v Carney,
 
 27 F Supp 388, 390 (D Mass 1939)]).
 

 The purposes of res judicata “must inform the decision to foreclose future litigation”
 
 (Ellis, supra,
 
 197 Conn, at 466, 497 A2d, at 990). A “decision whether to apply * * * res judicata to claims that have not actually been litigated should be made based upon a consideration of the doctrine’s underlying policies, namely, the interests of the defendant and of the courts in bringing litigation to a close * * * and the competing interest
 
 *184
 
 of the plaintiff in the vindication of a just claim”
 
 (Isaac,
 
 253 Conn, at 422, 752 A2d, at 513,
 
 supra
 
 [citation omitted]). Fundamentally, under Connecticut law, “[t] he judicial doctrines of res judicata and collateral estoppel are based on the public policy that a party should not be able to relitigate a matter which it already has had an opportunity to litigate. * * * Stability in judgments grants to parties and others the certainty in the management of their affairs which results when a controversy is finally laid to rest”
 
 (In re Juvenile Appeal [83-DE],
 
 190 Conn 310, 318, 460 A2d 1277, 1282 [citation omitted]).
 

 “But by the same token, the internal needs of the judicial system do not outweigh its essential function in providing litigants a legal forum to redress their grievances”
 
 (Ellis,
 
 197 Conn, at 466, 497 A2d, at 990,
 
 supra).
 
 The Connecticut Supreme Court has not explained how a court’s use of the phrase “with prejudice” interacts with that State’s res judicata doctrine. Specifically, the Court has not addressed whether a “with prejudice” disciplinary dismissal should be considered “on the merits” and, thus, given preclusive effect. Other Connecticut courts have reached differing results on the issue. In
 
 Hampson v Hampson,
 
 the Superior Court held that “[i]t can be fairly concluded that ‘with prejudice’ ordinarily is synonymous with adjudication on the merits, barring further litigation on that cause of action” (1999 WL 956872,
 
 *2,
 
 1999 Conn Super LEXIS 2725, *4 [citation omitted]). However, in
 
 Marcus v Pascoe,
 
 the Superior Court observed that the interpretation of “with prejudice” in
 
 Hampson
 
 was based on Federal case law and stated that “[w]hile this court readily acknowledges termination of litigation ‘with prejudice’ under the Federal Rules, it is far less clear that dismissals or nonsuits ‘with prejudice’ exist under Connecticut Statutory or Practice Book authority” (2000 WL 726353,
 
 *2,
 
 2000 Conn Super LEXIS 1231, *5). In any event, we are persuaded that the Connecticut Supreme Court would not give the dismissal res judicata effect here.
 

 The Connecticut Supreme Court has indicated that “[c]ases disposed of on technical grounds are not judgments on the merits” for res judicata purposes
 
 (Cain v Moore,
 
 182 Conn 470, 474, 438 A2d 723, 725,
 
 cert denied
 
 454 US 844), and that res judicata does not apply when “the trial court’s dismissal was based on untimeliness and not on the merits of the claim”
 
 (Linden Condominium Assn. v McKenna,
 
 247 Conn 575, 595, 726 A2d 502, 512). That court has also expressly held that a
 
 *185
 
 disciplinary dismissal of a plaintiffs action for failure to prosecute with reasonable diligence in the Superior Court (equivalent to our Supreme Court) does not constitute a judgment on the merits for the purposes of res judicata
 
 (see, Milgrim v Deluca,
 
 195 Conn 191, 194-195, 487 A2d 522, 524-525).
 

 Mindful of these competing interests, Connecticut’s highest court has repeatedly held that “[t]he doctrines of preclusion * * * should be
 
 flexible
 
 and must give way when their
 
 mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies” (In re Juvenile Appeal [83-DE],
 
 190 Conn, at 318, 460 A2d, at 1282,
 
 supra
 
 [emphasis added];
 
 see also, Isaac,
 
 253 Conn, at 423, 752 A2d, at 513,
 
 supra; Ellis,
 
 197 Conn, at 466, 497 A2d, at 990,
 
 supra).
 
 Moreover, “the scope of matters precluded necessarily depends on what has occurred in the former adjudication”
 
 (Ellis,
 
 197 Conn, at 467, 497 A2d, at 990,
 
 supra).
 
 Thus it appears that, in determining whether Connecticut would have applied claim preclusion, we must look to the factual circumstances of the dismissal of the first proceeding while also considering the competing concerns of finality of judgments and other social policies.
 

 Connecticut law recognizes that a child has substantial personal and financial interests in the identification of his or her parent
 
 (see, Lavertue v Niman,
 
 196 Conn 403, 408, 493 A2d 213, 216-217). Indeed, the Connecticut Supreme Court has referred to the State’s interest in a paternity proceeding concerning a child on public assistance as “manifest and enduring”
 
 (id.,
 
 196 Conn, at 406, 493 A2d, at 215). Similar to New York, Connecticut statutes facilitate these interests by mandating blood testing in paternity proceedings and acknowledging the capacity of tests to establish paternity by creating a presumption of paternity based on the results
 
 (see,
 
 Conn Gen Stat § 46b-168 [b];
 
 see also,
 
 Family Ct Act § 418).
 

 In
 
 Little v Streater
 
 (452 US 1, 13) — a Connecticut case — the United States Supreme Court noted the constitutional significance “of familial bonds, whether or not legitimized by marriage” and concluded that both the child and the father in a paternity action have a “compelling interest in the accuracy of [the] determination.” The Court specifically acknowledged Connecticut’s legitimate interest “in the welfare of a child born out of wedlock who is receiving public assistance, as well as in securing support for the child from those legally responsible”
 
 (id.,
 
 at 14). Connecticut law, moreover, establishes that,
 

 
 *186
 
 “both the father and the child in a paternity proceeding have an interest in seeing that these rights are accurately adjudicated. The child’s interests in this regard are particularly strong. ‘Any determination that a particular individual is a child’s biological father may have profound sociological and psychological ramifications * * * It is in the child’s interest not only to have it adjudicated that
 
 some
 
 man is his or her father and thus liable for support, but to have some assurance that the correct person has been so identified’ ”
 
 (Lavertue v Niman,
 
 196 Conn, at 409, 493 A2d, at 217,
 
 supra
 
 [quoting
 
 Salas v Cortez,
 
 24 Cal 3d 22, 33-34, 593 P2d 226, 234,
 
 cert denied
 
 444 US 900]).
 

 These are powerful considerations that, combined with the Attorney General’s mishandling of the case and the dismissal on technical grounds, outweigh the finality concerns of res judicata. The child and her mother should have been given an opportunity for a hearing of their paternity claim. Paternity determinations, implicating rights of a fundamental importance, are now made with astonishing accuracy. In
 
 Pickett v Brown
 
 (462 US 1, 17), the United States Supreme Court recognized that “scientific advances in blood testing have alleviated the problems of proof surrounding paternity actions.” “Science has since developed to the point that genetic testing of tissue or blood is capable, not only of excluding, but also proving paternity, in some cases to an exceptionally high degree of probability”
 
 (Matter of Clara C. v William
 
 L., 96 NY2d 244, 256 [Levine, J., concurring]).
 

 The Connecticut Supreme Court favors giving parties an opportunity to be heard on the merits of their claims in its res judicata jurisprudence
 
 (see, Linden Condominium Assn. v McKenna,
 
 247 Conn, at 594-595, 726 A2d, at 511-512,
 
 supra; Southport Manor Convalescent Ctr. v Foley,
 
 216 Conn 11, 16, 578 A2d 646, 648). Given the strong interest of Connecticut in the identification of a parent-child relationship and the unique nature of proof in that regard, we are convinced that in this case — where there was no adjudication of paternity because of governmental missteps — Connecticut would have found the paternity determination more important than the convenience afforded by finality, and would not have given the disciplinary dismissal preclusive effect. Indeed, one Connecticut trial court has reached the same conclusion in the context of a motion to open a judgment, holding that “the right of the child to a conclusive determination of paternity supersedes the need for
 
 *187
 
 finality of judgments, and the ease with which a confirming test of paternity can now be determined, requires a conclusive firiding of paternity”
 
 (Lillibridge v Lillibridge,
 
 1998 WL 851438, *1, 1998 Conn Super LEXIS 3291, *1). Thus, we need not reach Luna’s due process argument and we conclude that the first Connecticut proceeding does not preclude Luna’s opportunity to seek a paternity determination here. Luna and her child deserve their day in court.
 

 Accordingly, the order of the Appellate Division should be reversed with costs, and respondent’s motion to dismiss the petition denied.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick, Rosenblatt and Graffeo concur.
 

 Order reversed, etc.
 

 [1]
 

 . The Uniform Support of Dependents Law — codified in article 3-A of the Domestic Relations Law — was repealed at the end of 1997 and replaced by the Uniform Interstate Family Support Act in Family Court Act article 5-B
 
 (see,
 
 L 1997, ch 398, § 36).
 

 [2]
 

 . It has been noted that “interstate cases are not as zealously pursued as intrastate cases” because “ ‘the responding state bears most of the expense incurred in interstate enforcement while the initiating state enjoys most of the benefits’ ” (Janelle T. Calhoun,
 
 Interstate Child Support Enforcement System: Juggernaut of Bureaucracy,
 
 46 Mercer L Rev 921, 943 [citation omitted]).
 

 [3]
 

 . This paternity petition, dated December 2, 1997, was brought under Family Court Act article 5-B, § 580-201 (6), which allows New York to exercise “long-arm” jurisdiction over a nonresident based on an allegation that the child was conceived as a consequence of sexual relations in this State. The enactment of article 5-B, effective December 31, 1997, replaced the transfer process in the now-repealed Domestic Relations Law article 3-A (L 1997, ch 398, § 36). Both parties appear to have operated under an assumption that article 5-B was effective throughout this case.
 

 [4]
 

 . Since Connecticut law decides this matter and in light of the key role the Connecticut Attorney General’s office played in the Connecticut proceedings, we invited the Connecticut Attorney General to file an amicus brief. The Attorney General declined our invitation.